EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos<br>_____<br><br>Carliz De La Cruz Hernández<br><br>Recurrida<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Peticionarios<br>_____<br><br>Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos | Certiorari<br><br>2026 TSPR 74<br><br>218 DPR ___ |

Número del Caso: CC-2025-0212
            cons. con CC-2025-0214 y CC-2025-0228

Fecha: 8 de julio de 2026

Tribunal de Apelaciones:

    Panel Especial

**CC-2025-0212**

Representantes legales de la parte peticionaria:

    Lcdo. José M. Marxuach Fagot
    Lcda. Joanna Bocanegra Ocasio

Representantes legales de los recurridos:

Noah Asad Byrne

Lcdo. Joel Andrew Cosme Morales
Lcdo. Pedro Ortiz Álvarez

Benito A. Martínez Ocasio

Lcdo. Eugenio J. Torres Oyola
Lcdo. Jean G. Vidal Font
Lcda. Karla-In Encarnación Pak
Lcdo. Víctor Rodríguez Reyes

Rimas Entertainment LLC.

Lcdo. Oreste R. Ramos
Lcda. María D. Trelles Hernández
Lcda. María Elena Martínez Casado
Lcda. Marielena Melero Pardo

**CC-2025-0214**

Representantes legales de la parte peticionaria:

Rimas Entertainment LLC.

Lcdo. Oreste R. Ramos
Lcda. María D. Trelles Hernández
Lcda. María Elena Martínez Casado
Lcda. Marielena Melero Pardo

Noah Asad Byrne

Lcdo. Joel Andrew Cosme Morales
Lcdo. Pedro Ortiz Álvarez

Benito A. Martínez Ocasio

Lcdo. Eugenio J. Torres Oyola
Lcdo. Jean G. Vidal Font
Lcda. Karla-In Encarnación Pak
Lcdo. Víctor Rodríguez Reyes

Representantes legales de la recurrida:

Lcdo. José M. Marxuach Fagot
Lcda. Joanna Bocanegra Ocasio

**CC-2025-0228**

Representantes legales de la parte peticionaria:

Lcdo. José M. Marxuach Fagot
Lcda. Joanna Bocanegra Ocasio

Representantes legales de los recurridos:


Noah Asad Byrne

Lcdo. Joel Andrew Cosme Morales
Lcdo. Pedro Ortiz Álvarez

Benito A. Martínez Ocasio

Lcdo. Eugenio J. Torres Oyola
Lcdo. Jean G. Vidal Font
Lcda. Karla-In Encarnación Pak
Lcdo. Víctor Rodríguez Reyes

Rimas Entertainment LLC.

Lcdo. Oreste R. Ramos
Lcda. María D. Trelles Hernández
Lcda. María Elena Martínez Casado
Lcda. Marielena Melero Pardo


Materia: Ley de Derechos Morales de Autor; Ley del Derecho sobre la Propia Imagen; Procedimiento Civil - Relación entre varios derechos reconocidos por el ordenamiento jurídico sobre el uso no consentido de la voz de una persona; análisis que deben realizar los tribunales sobre la autoría y el requisito de originalidad de la obra al evaluar una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos<br>_____<br><br>Carliz De La Cruz Hernández<br><br>Recurrida<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Peticionarios<br>_____<br><br>Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos | CC-2025-0212<br><br>Cons. con<br><br><br><br><br><br>CC-2025-0214<br><br><br>Cons. con<br><br><br><br><br>CC-2025-0228 |

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 8 de julio de 2026.

Por primera vez examinamos la relación entre varios derechos reconocidos por nuestro ordenamiento jurídico sobre el uso no consentido de la voz de un individuo. Así, en el contexto de una moción de desestimación, se alegan

violaciones a los derechos morales de atribución e integridad sobre una obra y al derecho a la propia imagen por el uso de la voz de la parte demandante. Por consiguiente, las acciones presentadas se amparan en la *Ley de Derechos Morales de Autor*, *infra*, la *Ley del Derecho sobre la Propia Imagen*, *infra*, el Derecho a la Intimidad, el Art. 1536 del Código Civil, *infra*, y en principios generales de derecho.

Analizados los elementos de la causa de acción provista en la *Ley de Derechos Morales de Autor*, *infra*, destacamos que, a través de este estatuto, nuestro ordenamiento jurídico protege el derecho moral sobre las creaciones del intelecto. Para ello se requiere de una *obra original y creativa*. Así, tras examinar el origen y significado de estos conceptos, concluimos que la parte demandante presentó hechos plausibles en la Demanda sobre la existencia de una obra original y creativa en cuanto a su interpretación en la grabación sonora en controversia. Por lo tanto, no procedía la desestimación de la acción presentada bajo ese estatuto.

Segundo, en cuanto a la causa de acción por violaciones al derecho a la intimidad, en su vertiente del derecho a la propia imagen, sostenemos que basta la presentación de hechos demostrativos en la Demanda de que la imagen de una persona fue capturada, reproducida o publicada, entre otras formas de uso, sin su consentimiento expreso o tácito. Por ello, no procedía su desestimación en esta etapa de los procedimientos, toda vez que la falta de consentimiento fue

expuesta en la Demanda y no prosperó la defensa presentada para justificar el uso de la imagen.

Tercero, reconocemos que la causa de acción sobre el uso no autorizado de la imagen de una persona al amparo de la *Ley del Derecho sobre la Propia Imagen*, *infra*, requiere de un propósito comercial, mercantil o publicitario. No obstante, en el contexto de una Moción de Desestimación, como la presentada en el caso de autos, concluimos que la parte demandante presentó hechos suficientes para sostener un uso comercial plausible, mientras que los demandados no lograron establecer con toda certeza que la demandante no tenía derecho a remedio alguno. Por lo tanto, no erraron los tribunales inferiores al no desestimar la causa de acción presentada.

Por último, reconocemos la aplicación de la Regla de Publicación Única ("single publication rule") en acciones relacionadas al derecho a la propia imagen. Por ello, no erraron los foros inferiores al concluir que las causas de acción relacionadas al uso de la voz de la demandante en la canción "Pa ti" publicada en el 2016 y cuya demanda fue presentada en el 2023, estaban prescritas.

## I.

El 1 de marzo de 2023, la Sra. Carliz De La Cruz Hernández (señora De la Cruz Hernández o parte demandante) presentó una Demanda contra Rimas Entertainment, LLC (Rimas); el Sr. Noah Kamil Assad Byrne (señor Assad Byrne); el Sr. Benito A. Martínez Ocasio, conocido por el nombre

artístico "Bad Bunny" (señor Martínez Ocasio o artista); Rimas Classics, LLC; Noah Assad, LLC y otros de nombre sin identificar. En la Demanda, alegó daños al amparo de la Ley Núm. 55-2012, conocida como la *Ley de Derechos Morales de Autor de Puerto Rico* (31 LPRA sec. 1401i *et seq*.); la Ley Núm. 139-2011, conocida como *Ley del Derecho sobre la Propia Imagen*, (32 LPRA sec. 3151 *et seq*.); el Art. 1536 del Código Civil de 2020 (31 LPRA sec. 10801); las doctrinas de enriquecimiento injusto y actos propios, y en la alternativa, por la violación al derecho constitucional a la intimidad por el uso no autorizado de la propia imagen no comercial de la demandante.

En la Demanda, la señora De la Cruz Hernández indicó que desde el 2011 sostuvo una relación de noviazgo con el señor Martínez Ocasio, quien para el 2014 manifestó su interés por incursionar en la industria musical y creaba "pistas, ritmos y canciones".[1] Expresó que ella colaboró en distintos aspectos del inicio de su carrera. Asimismo, reconoció que era costumbre de los cantantes de música urbana mencionar sus nombres en las canciones, empero, ambos decidieron que sería una "idea cautivadora" que seguido al nombre artístico del señor Martínez Ocasio se incluyera la palabra "baby", y que la frase se grabara con la "voz distinguible" de la señora De la Cruz Hernández.[2] Expresó

---

[1] *Demanda*, Apéndice del Recurso CC-2025-0212, pág. 61.

[2] *Demanda*, Apéndice del Recurso CC-2025-0212, págs. 56 y 62. Las partes utilizan indistintamente los términos "frase", "etiqueta", "tag" y "estribillo" para referirse a la frase "Bad Bunny Baby" en controversia.

que en el 2015, a petición del señor Martínez Ocasio, grabó con su voz la frase "Bad Bunny Baby" y que esta se utilizó en los "intros" (introducciones) de las canciones del señor Martínez Ocasio publicadas en una plataforma de música.[3]

Añadió que, tras una ruptura de su relación en mayo de 2016, la frase creada y el sonido de su voz fueron incluidos sin su consentimiento, sin su autorización por escrito, ni la correspondiente atribución en "canciones, discos, promociones, conciertos en el mundo entero y plataformas sociales y musicales, televisión y radio".[4] Sostuvo que tal uso fue en violación a sus derechos morales de atribución e integridad sobre la obra y con propósitos comerciales en violación a su derecho de imagen.[5] Específicamente, indicó que el 26 de diciembre de 2016, la canción "Pa Ti" fue publicada bajo el sello discográfico de Rimas Entertainment, LLC y que la letra de la canción registrada incluye la frase y la voz de la señora De la Cruz Hernández sin su consentimiento, sin su autorización por escrito, ni

---

[3] La Sra. Carliz De la Cruz Hernández expresa que "[e]ntre los años 2015 y 2016, Martínez publicó en la plataforma de música *SoundCloud* los temas: "Solo Avísame", "Get", "Pa Que Le De", "La T Shirt de Biggie", "Tentación", "Diles", entre otros, con la voz de la demandante diciendo "Bad Bunny Baby". En cuanto a estas, no alega violación a sus derechos de autor o imagen. *Demanda*, Apéndice del Recurso CC-2025-0212, pág. 62.

[4] *Demanda*, Apéndice del Recurso CC-2025-0212, pág. 74.

[5] *Id.* pág. 56. Alega específicamente que "[l]os demandados violaron el derecho de atribución de la demandante al no darle el crédito por la obra o creación de las letras y canción, ya bien porque no hicieron las debidas averiguaciones respecto a la autoría de la misma o en la alternativa, a sabiendas de que la misma pertenecía a la demandante y optaron por omitir la información de su nombre". *Id.* págs. 70-71. Alega además, que "[l]os demandados violaron el derecho de integridad del autor al alterar, modificar y distorsionar la obra para publicarla en material promocional impreso según identificado antes". *Id.* pág. 71. (Énfasis en original omitidos).

atribución. Reconoció que para el 2017, el señor Martínez Ocasio y ella retomaron su relación, pero no discutieron sobre el uso de la grabación en las canciones. Eventualmente, la relación terminó, pero se comunicaban ocasionalmente hasta el 2019.

La señora De la Cruz Hernández añadió que en el 2022 los demandados publicaron la canción "Dos Mil 16", en cuya letra registrada se incluye nuevamente la frase y su voz sin su consentimiento, sin su autorización por escrito, ni la correspondiente atribución. La señora De la Cruz Hernández señaló que para esta publicación, los representantes del artista, del señor Assad Byrne y de Rimas le enviaron unos contratos poco antes del lanzamiento y le ofrecieron comprar el uso retroactivo del "tag" en las canciones "Pa Ti" y "Dos Mil 16", así como para su uso futuro por la cantidad de dos mil dólares ($2,000). Sin embargo, indica que estos publicaron y vendieron el álbum titulado "Un Verano Sin Ti" que contenía su voz, sin importar que ella todavía no había dado su consentimiento. Indicó que previo a alcanzar el acuerdo, deseaba escuchar la canción en la que se usaría su voz, así como analizar el contrato mediante el que se pretendía que concediera una licencia del uso de su voz. Además, requería que el contrato fuera por escrito. Explicó que las canciones con su voz también fueron utilizadas en los conciertos celebrados en el Coliseo de Puerto Rico José Miguel Agrelot los días 28, 29 y 30 de julio de 2022, así como en conciertos realizados en Estados Unidos y el

extranjero. Sostuvo que este suceso provocó el acercamiento de "miles de personas" en sus redes sociales, por lo que requirió asistencia psicológica para manejar el sobresalto emocional producto de la situación.

En la alternativa, la señora De la Cruz Hernández expresó que "si el Tribunal entiende en su día que […] una canción o un disco no es una explotación comercial, entonces aplica el derecho de la imagen no comercial, el cual está protegido [por el derecho de intimidad]", así como las normas derivadas del derecho general de responsabilidad extracontractual, las doctrinas de enriquecimiento injusto y actos propios.[6]

Así las cosas, el 8 de mayo de 2024, tanto el señor Martínez Ocasio como Rimas Entertainment, LLC y Rimas Classics, LLC presentaron sus correspondientes mociones de desestimación al amparo de la Regla 10.2(5) de Procedimiento Civil de 2009 (32 LPRA Ap. V).[7] En estas solicitudes arguyeron que de las alegaciones de la Demanda no se justificaba la concesión de un remedio. En esencia,

---

[6] *Demanda*, Apéndice del Recurso CC-2025-0212, pág.78.

[7] El 5 de abril de 2023, Rimas Entertainment, LLC, el Sr. Noah Kamil Assad Byrne y el Sr. Benito A. Martínez Ocasio solicitaron el traslado de la Demanda al Tribunal Federal para el Distrito de Puerto Rico. Esta fue devuelta el 31 de marzo de 2024, por no haberse demostrado la existencia de jurisdicción federal.

Asimismo, el 8 de mayo de 2024, el Sr. Noah Kamil Assad Byrne y Noah Assad, LLC, presentaron una *Solicitud de desestimación por insuficiencia en el emplazamiento y falta de jurisdicción sobre la persona*. Luego de varios trámites, el 29 de julio de 2024, el señor Assad Byrne presentó su Contestación a Demanda. *Contestación a Demanda*, Apéndice del Recurso CC-2025-0214, pág. 770. El 5 de agosto de 2024, Noah Assad, LLC presentó su *Contestación a Demanda* y *Solicitud de Desestimación al Amparo de la Regla 10.2(5) de Procedimiento Civil*. Apéndice del Recurso CC-2025-0214, págs. 836-924.

sostuvieron que no procedía la reclamación al amparo de la *Ley de Derechos Morales de Autor*, *supra*, debido a que la etiqueta y la grabación en controversia no cumplían con los criterios mínimos de originalidad y creatividad de una obra, por ser una frase común generalmente utilizada en el género urbano y, por lo tanto, no estaba protegida jurídicamente bajo el estatuto. Además, alegaron que todas las reclamaciones que involucraran la obra musical "Pa Ti", publicada en el 2016, estaban prescritas por haberse presentado en el 2023. Asimismo, sostuvieron que no procedían las reclamaciones por el uso de la etiqueta ni de la grabación en los conciertos fuera de la jurisdicción de Puerto Rico. En cuanto a la obra musical "Dos Mil 16", expresaron que no había una causa de acción por derecho a la propia imagen, debido a que su uso no fue comercial o publicitario, aunque el señor Martínez Ocasio generara algún tipo de ingreso por ella y que tampoco había una causa de acción en cuanto al derecho a la intimidad, por no alegarse qué expectativa tenía sobre el uso de su voz. También expresaron que al haber la señora De la Cruz Hernández invocado leyes especiales, no procedía una acción en daños por ser duplicativa.[8]

El 27 de junio de 2024, el Sr. Noah K. Assad Byrne presentó una Moción de Desestimación en la que se hizo eco

---

[8] *Moción de Desestimación* presentada por el señor Martínez Ocasio, Apéndice del Recurso CC-2025-0212, pág.78. Véase, además, *Moción de Desestimación* presentada por Rimas, Apéndice del Recurso CC-2025-0214, pág.383.

de los argumentos presentados por los codemandados. Además, expresó que aunque administra la carrera del señor Martínez Ocasio y controla los activos corporativos, de las alegaciones de la Demanda no se desprendían hechos concretos y específicos sobre su participación directa, ni de que diera instrucciones por las que se le pueda imputar responsabilidad personal por las acciones llevadas a cabo por terceros. Añadió que la demandante tampoco presentó alegación alguna que indicara cómo responde por el hecho ajeno, ni responsabilidad objetiva alguna.

La señora De la Cruz Hernández presentó sus correspondientes oposiciones el 10 de junio de 2024 y el 2 de octubre de 2024. Mediante Sentencia Parcial de 13 de septiembre de 2024, el foro primario atendió las mociones de desestimación presentadas por los demandados. Finalmente, desestimó el pleito en cuanto a Rimas Classics, LLC y Noah Assad, LLC. Concluyó que la señora De la Cruz Hernández no tenía derecho de propiedad intelectual sobre la frase "Bad Bunny Baby", por ser una frase compuesta de tres palabras que alude al nombre artístico del señor Martínez Ocasio y cuya transformación era insuficiente para colocarle en el escenario de la propiedad intelectual. Por ello, declaró con lugar de forma parcial las mociones presentadas y desestimó la causa de acción al amparo de la *Ley de Derechos Morales de Autor*, *supra*, en cuanto a ambas canciones. Asimismo, determinó que las causas de acción sobre la canción "Pa Ti" estaban prescritas al no alcanzar a satisfacer la teoría

cognoscitiva del daño y su vertiente sucesiva en vista de que la demandante mantuvo comunicación con el señor Martínez Ocasio hasta el 2019.  No obstante, en cuanto a la canción "Dos Mil 16" concluyó que no procedía desestimar la causa en daños y perjuicios en su modalidad vicaria ni en cuanto a la de la *Ley del Derecho sobre la Propia Imagen*, *supra,* dado de que la Demanda expuso de manera plausible hechos que apuntan a un fin comercial de la grabación o la voz de la demandante en la canción. Sin embargo, desestimó la causa de acción sobre la alegada violación al derecho a la intimidad, al no revelarse en la Demanda cuál era la expectativa de intimidad que tenía la demandante en cuanto al uso de la grabación o su voz.[9] Por último, desestimó las causas de acción amparadas en las doctrinas de enriquecimiento injusto y actos propios, así como las relacionadas al uso de las canciones en los conciertos.

Por otro lado, en cuanto a la solicitud del señor Assad Byrne, el Tribunal de Primera Instancia no desestimó las causas de acción por daños y perjuicios en modalidad vicaria por el uso no consentido de la grabación en la canción "Dos Mil 16" y por el uso comercial de la imagen en la referida canción sin autorización de la demandante. Mediante Resolución de 13 de noviembre de 2024, notificada al día siguiente, el foro de instancia declaró No Ha Lugar la

---

[9] Las posteriores solicitudes de reconsideración fueron denegadas.

solicitud de desestimación solicitada por el señor Assad Byrne.

La señora De la Cruz Hernández (KLAN202401123), Rimas (KLCE202401359) y el señor Assad Byrne (KLCE202500026) recurrieron al Tribunal de Apelaciones. Los primeros dos recursos fueron consolidados. Así, mediante Sentencia emitida el 14 de febrero de 2025, notificada el 18 de febrero de 2025, ese foro confirmó el dictamen de 13 de septiembre de 2024. No obstante, el 18 de febrero de 2025, el foro apelativo intermedio revocó la Resolución de 13 de noviembre de 2024 y desestimó todas las causas de acción presentadas contra el señor Assad Byrne.[10]

Así las cosas, oportunamente la señora De la Cruz Hernández presentó ante nos los recursos CC-2025-0212 y CC-2025-0228, mientras que Rimas presentó el recurso CC-2025-0214.

En el Recurso CC-2025-0212 la señora De la Cruz Hernández presentó cinco señalamientos de error. Primero, señaló que el foro recurrido erró al confirmar la desestimación de varias causas de acción tras exigirle un estándar mayor en las alegaciones de la Demanda y añadir requisitos de derecho ajenos al examen correspondiente, tales como requerirle que especificara cuál era su expectativa de intimidad en la causa de acción por violación al derecho de imagen no comercial, o al interpretar el significado del concepto "obra" de la

---

[10] La señora De la Cruz Hernández solicitó la reconsideración de la Sentencia de 18 de febrero de 2025. Esta fue declarada No Ha Lugar el 21 de marzo de 2025.

*Ley de Derechos Morales de Autor*, *supra*, utilizando de referencia el *Copyright Act*, *infra*.[11] Segundo, señaló como error que confirmara la desestimación de la causa de acción de daños morales a pesar de que la voz, la frase y la combinación de ambas estaban protegidas por una ley especial. Tercero, indicó que erró el foro recurrido al confirmar la desestimación por prescripción de las causas de acción relacionadas a la canción "Pa Ti". Cuarto, señaló como error que se confirmara la desestimación de la causa de acción sobre violaciones al derecho de imagen no comercial que surgen del derecho constitucional de la intimidad. Quinto, indicó que erró el foro recurrido al confirmar la desestimación de las causas de acción sobre el uso de las canciones "Pa Ti" y "Dos Mil 16" en la gira de conciertos, ya que el derecho sobre el uso de su voz y frase en ambas canciones son acciones independientes a la grabación del disco.

Por último, en el Recurso CC-2025-0228 la señora De la Cruz Hernández señaló como error la determinación de que las alegaciones presentadas en la Demanda carecían de la especificidad y de fundamentos necesarios para establecer una relación causal entre los actos imputados y las alegaciones en contra del señor Assad Byrne.

Por otro lado, en el Recurso CC-2025-0214 Rimas señaló como error que se confirmara la no desestimación de la causa

---

[11] Véase también, primer señalamiento de error de la Petición de *Certiorari* CC-2025-0228.

de acción al amparo de la *Ley del Derecho sobre la Propia Imagen*, *supra*, a pesar de la ausencia de hechos demostrativos en la Demanda de que el uso de la voz de la demandante fue para propósitos comerciales.[12]

Expedimos y consolidamos los tres recursos. Contando con la comparecencia de todas las partes, estamos en posición de resolver.

## II.

Previo a contestar una demanda presentada en su contra, la parte demandada puede solicitar la desestimación cuando de las alegaciones de la demanda surge que alguna defensa afirmativa derrotará la pretensión del demandante. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1135 (2024); *Costas Elena y otros v. Magic Sport y otros*, 213 DPR 523, 533 (2024); *Eagle Security v. Efrón Dorado et al.*, 211 DPR 70 (2023). Así, la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, establece como fundamentos o defensas por los que se puede solicitar la desestimación de la demanda: la falta de jurisdicción sobre la materia o la persona, la

---

[12] Rimas también señaló como error que no se desestimara la causa de acción en daños y perjuicios bajo el Código Civil a pesar de que la Ley Núm. 139-2011, conocida como *Ley del Derecho sobre la Propia Imagen*, (32 LPRA sec. 3151 *et seq*.), gobierna la reclamación. Añade que tampoco se pueden duplicar remedios. Este señalamiento de error no amerita un examen más profundo ante nuestras continuas y recientes expresiones. Un demandante puede presentar en la demanda todas las reclamaciones independientes o alternativas que tenga contra la parte adversa, estén o no relacionadas entre sí. Regla 14.1 de Procedimiento Civil, 32 LPRA Ap. V. Véase sobre la concurrencia de acciones y duplicidad de remedios, *Consejo Titulares v. MAPFRE,* 208 DPR 761 (2022).

Ante una moción de desestimación, el adjudicador deberá examinar cada reclamación, ya sea independiente o alternativa, para determinar si cada una justifica o no la concesión de un remedio y proceder a su desestimación cuando corresponda. *Cobra Acquisitions v. Mun. Yabucoa et al.,* 210 DPR 384, 400-401 (2022).

insuficiencia del emplazamiento o su diligenciamiento, el dejar de exponer una reclamación que justifique la concesión de un remedio o el dejar de acumular una parte indispensable. *Díaz Vázquez et al. v. Colón Peña et al.*, *supra*; *Rivera, Lozada v. Universal*, 214 DPR 1007 (2024); *Costas Elena y otros v. Magic Sport y otros*, *supra*; *Conde Cruz v. Resto Rodríguez et al.*, 205 DPR 1043 (2020).

Cuando la moción de desestimación se fundamenta específicamente en que *la demanda dejó de exponer una reclamación que justifique la concesión de un remedio*, esta se dirige a los méritos de la controversia por lo que corresponde a la parte demandada establecer con toda certeza que la parte demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que pueda ser probado en apoyo a su reclamación. *Rivera, Lozada v. Universal*, *supra*; *Eagle Security v. Efrón Dorado et al.*, *supra*. Esto es así aun interpretando la demanda de la forma más liberal posible a su favor, pues lo que ataca es un vicio intrínseco de la demanda y no los hechos aseverados. *Díaz Vázquez et al. v. Colón Peña et al.*, *supra*, pág. 1150; *Cobra Acquisitions v. Mun. Yabucoa et al.*, 210 DPR 384 (2022).

Al evaluar una moción de desestimación bajo la Regla 10.2 de Procedimiento Civil, *supra*, los tribunales tienen que dar por ciertos todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente por lo que de su faz no den margen a dudas. *Díaz Vázquez et al. v. Colón Peña et al.*, *supra*; *Rivera, Lozada*

*v. Universal*, *supra*. A su vez, deben identificar y eliminar de su análisis aquellos hechos o alegaciones concluyentes, es decir, las "conclusiones de derecho no apoyadas por hechos o alegaciones redactadas de manera general para referirse a los elementos de una causa de acción o que su contenido resulte hipotético, y alegaciones descarnadas de hechos que apoyen las aseveraciones". S. Steidel Figueroa, *Controversias en el Ordenamiento Procesal Civil: A propósito del Seminario de Procedimiento Civil*, 47(3) Rev. Jur. UIPR 793, 800 (2012-2013). Además, deberán evaluar estas alegaciones conjuntamente y de la forma más favorable a la parte demandante. *Rivera, Lozada v. Universal*, *supra*. Cumplido con lo anterior, los tribunales tienen entonces que examinar si los hechos aceptados son suficientes para constituir una reclamación válida contra el demandado, es decir, que la demanda establece una reclamación plausible de que el demandado es responsable de lo que se le imputa más allá de un nivel especulativo y por lo que se justifica la concesión de un remedio. Este análisis debe ser guiado por la experiencia y el sentido común del juzgador.[13] *Costas Elena y otros v. Magic Sport y otros*, *supra*, pág. 534. Véase además, R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. LexisNexis,

---

[13] Hemos reiterado que una demanda no debe ser desestimada cuando pueda ser enmendada para subsanar cualquier posible deficiencia. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1135, 1151 (2024). Por otro lado, cuando en la demanda se solicitan remedios alternativos, hemos señalado que el análisis de los tribunales debe incluir si las alegaciones sustentan la concesión ya sea del remedio principal o del alternativo. *Cobra Acquisitions v. Mun. Yabucoa et al.*, *supra*, pág. 397.

2017, pág. 307. La controversia no es si el demandante va a finalmente prevalecer, sino, si asumiendo como ciertos los hechos bien alegados en la demanda, tiene derecho a ofrecer prueba que justifique su reclamación. J. A. Cuevas Segarra, *Tratado de derecho procesal civil,* 2da ed., San Juan, Pubs. JTS, 2011, T. II, pág. 530. "La posibilidad de obtener los hechos necesarios mediante el descubrimiento de prueba no subsana la deficiencia de una alegación conclusoria". R. Hernández Colón, *op. cit.*, pág. 307, n. 7. Por el contrario "no se puede permitir que proceda una demanda insuficiente bajo el pretexto de que se podrán probar las alegaciones conclusorias con el descubrimiento de prueba". *Costas Elena y otros v. Magic Sport y otros*, *supra*, pág. 534.

Como acertadamente resume el Pleno de Numerarios por voz del Numerario Hon. Rafael Martínez Torres,

> "se requiere que los tribunales identifiquen los elementos que establecen la causa de acción, que acepten por ciertos todos los hechos bien alegados en la demanda, que elimine del análisis las conclusiones legales que omita los elementos apoyados por aseveraciones conclusorias. Luego debe determinar si, a base de los hechos bien alegados, la demanda establece una reclamación plausible que justifique que el demandante tiene derecho a un remedio, guiado en su análisis por la experiencia y el sentido común. De determinar que no cumple con el estándar de plausibilidad, el tribunal debe desestimar y no permitir que una demanda insuficiente proceda bajo el pretexto de que el descubrimiento de evidencia se pudieran probar las alegaciones conclusorias". R. Martínez Torres, *Dictamen del Pleno de Numerarios sobre el Estándar de Plausibilidad y la Regla 6 de Procedimiento Civil*, Dictamen 2024-01, XXV Rev. Acad. PR Juris. & Legis. 79, 95(2025).

Con esto en mente, procedemos a examinar cada causa de acción presentada y de cuya desestimación se recurre.

### III.

### A. Derechos Morales de Autor

La propiedad intelectual es el conjunto de derechos que la ley reconoce al autor sobre las obras que ha producido con su inteligencia. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884 (2016); *Harguindey Ferrer v. U.I.,* 148 DPR 13, 21 (1999); *Cotto Morales v. Ríos*, 140 DPR 604, 611 (1996). Particularmente, los derechos de autor se agrupan en dos categorías que protegen facultades distintas: los derechos patrimoniales (*copyrights*) -que consisten en el monopolio de la explotación económica de la obra- y los derechos personales o morales -que protegen la relación personalísima del autor y su obra, particularmente la paternidad sobre la misma y su integridad.[14] *S.L.G. Negrón-Nieves v. Vera Monroig*, 182 DPR 218 (2011). Los primeros están protegidos por la *Copyright Act*,[15] mientras que los segundos, lo están por la *Ley de Derechos Morales de Autor*, *supra*.[16]

---

[14] Para una exposición más detallada sobre la coexistencia de los derechos patrimoniales y los derechos morales bajo la derogada Ley Núm. 96 de 15 de julio de 1988, según enmendada, conocida como Ley de Propiedad Intelectual de Puerto Rico, 31 LPRA ant. sec. 1401 *et seq.*, véase, *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884 (2016).

Cabe señalar que mediante Resolución de la Corte Federal, ese foro no encontró existencia de jurisdicción federal en este caso que ocupara el campo. Véase, nota 7. Por lo cual, corresponde examinar las acciones estatales presentadas. *Reynal v. Tribunal Superior*, 102 DPR 260 (1974).

[15] 17 USCA Sec. 101 *et seq*.

[16] De manera supletoria aplican aquellas disposiciones del Código Civil que no sean incompatibles con la ley. Art. 27 del Código Civil, 31 LPRA Sec. 5349. Véase además, *Sucn. Rosado v. Acevedo Marrero*, *supra*.

Por consiguiente, la protección de los derechos morales en nuestro ordenamiento requiere de un "autor" y de una "obra".  Esto, pues, la "(a)utoría es una condición *sine qua non* para cualquier reclamo de derechos de autor". *Harguindey Ferrer v. UI, supra*, pág. 21.  No obstante, previo a la promulgación de la *Ley de Derechos Morales de Autor, supra*, estos términos ("autor" y "obra") no estaban definidos estatutariamente,[17] lo que conllevó que acudiéramos tanto a tratadistas como al derecho federal para comprender su extensión.

Así, hemos expresado que el "autor es quien, como cuestión de hecho, crea la obra; esto es, la persona que transforma una idea a una expresión tangible, merecedora de protección por la ley de propiedad intelectual". *Harguindey Ferrer v. U.I., supra*, pág. 22. Aclarado que el concepto "obra" protege una expresión tangible,[18] esta "debe ser original del autor, en el sentido de que no sea copia de otra persona". Es decir, debe ser independiente, aunque no novedosa. Íd., pág. 24. Asimismo, hemos reconocido que la creación debe tener un grado mínimo de creatividad. Íd.,

---

Véase excepcionalmente, Visual Artists Rights Act, Pub. L. No. 101-650, 10 Stat. 5128 (1990), que protege los derechos morales de ciertas obras de arte visual; 17 USCA sec. 106A.

[17] Ley Núm. 96 de 15 de julio de 1988, *supra*. Véase, P.G. Salazar, *La protección legal del Autor puertorriqueño*, 2da ed., San Juan, InterJuris, 2013, pág. 363.

[18] Hemos descrito el "medio tangible" como aquel "objeto que permita el disfrute y la apreciación de la expresión personalísima del autor". *Sucn. Rosado v. Acevedo Marrero, supra*, pág. 900.

citando a *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 US 340, 345 (1991).

No obstante, con la promulgación de la *Ley de Derechos Morales de Autor*, *supra*, en el 2012, este nuevo cuerpo normativo incorporó varias definiciones relacionadas a estos conceptos. Así, "autor" es la "persona natural que genera una obra", y "obra" es la

> "creación original literaria, musical, visual (plástica o gráfica), dramática o de las artes interpretativas, artística, o de cualquier otro tipo de las que se producen con la inteligencia y que sea creativa, expresada en un medio, tangible actualmente conocido o que se invente en el futuro". 31 LPRA sec. 1401j(d).

Como podemos observar, la *Ley de Derechos Morales de Autor*, *supra*, especifica que la obra debe ser original y creativa. Del texto y de su historial legislativo podemos apreciar que la ley absorbió nuestra jurisprudencia, y que también se nutrió de la ley federal. Esto último tuvo el objetivo de minimizar posibles choques con el esquema estatutario del *Copyright Act*.[19] Por consiguiente, la definición de "obra" protegida por la *Ley de Derechos Morales de Autor*, *supra*, no solo requiere que sea producto de la inteligencia, sino que acoge los criterios federales que ya

---

[19] El proyecto original no contemplaba el término "creativa". Véase, P. del S. 2263 radicado el 6 de septiembre de 2011. Véanse además, Informe Positivo sobre el P. del S. 2263 de la Comisión de lo Jurídico Civil del Senado de Puerto Rico de 8 de noviembre de 2011, págs. 8 y 10; Ponencia de la Escuela de Derecho de la Universidad de Puerto Rico por voz del Prof. Walter O. Alomar Jiménez de 27 de septiembre de 2011, págs. 6 y 8 ("Se sugiere añadir el término y requisito de que la obra sea "original" según la Ley Federal de Copyright"); Ponencia del Colegio de Abogados de Puerto Rico de 28 de octubre de 2011, pág. 1 ("Se sugiere añadir el término y requisito de que la obra sea "original y creativa" según lo requiere la Ley Federal de Derechos de Autor (el Copyright Act)".).

fueron adelantados en *Harguindey Ferrer v. U.I., supra*, de "originalidad" y "creatividad" de la obra.

Cabe señalar que, aunque la protección del derecho moral del autor es un ámbito de protección diferente al de los derechos patrimoniales y nuestro ordenamiento jurídico no ciñe la obra a los criterios del *Copyright Act* para gozar de su protección, la normativa federal respecto a estas definiciones es persuasiva.[20] Así, para que una obra esté protegida por el derecho de *copyright*, debe ser original, es decir, ser una creación independiente de la persona autora y debe ser mínimamente creativa. *Feist Publications, Inc. v. Rural Telephone Service Co., supra*. "El grado de creatividad para que una obra pueda ser protegida no tiene que ser sustancial, pero tampoco puede ser negligible o trivial".[21] P.G. Salazar, *La protección legal del Autor puertorriqueño*, 2da ed., San Juan, InterJuris, 2013, pág. 18. Véase, 1 *Nimmer*

---

[20] *Ojeda v. El Vocero de P.R.*, 137 DPR 315, 335 (1994) ("[C]uando un estatuto sea adoptado de otra jurisdicción, y no aparezca en el historial legislativo algo en contrario, debe presumirse que se adoptó para fines de igual política pública la interpretación que al mismo se le ha dado en la jurisdicción de su origen, aun cuando, históricamente no existiera en Puerto Rico la situación que se quiso conjurar mediante la ley en esa otra jurisdicción".). No podemos obviar que "la Ley 55, al igual que su antecesora, incorpora principios y normas usualmente asociados a los derechos patrimoniales según fijados en la ley federal de 'copyright'". Salazar, *op. cit.*, pág. 365.

[21] *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 US 340, 345 (1991)("To qualify for copyright protection, a work must be original to the author. […] Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. […] To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. […] Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.")(citas omitidas).

*on Copyright* Sec. 2.01[B][2], pág. 2-17("[I]t refers to matter bearing a spark of distinctiveness in *copyrightable expression*".). Por consiguiente, como norma general en el derecho de *copyright*, las palabras y frases cortas, como nombres, títulos o *slogans* se consideran que no contienen la creatividad mínima que amerite la protección de la ley federal, aunque podrían ser protegidas por el régimen de marcas de fábrica o de servicio.[22] Esto es así pues, por su brevedad se consideran que no son suficientemente independientes o creativas, o ambas. 1 W.F. Patry, *Copyright Law and Practice* 333 (1994). No obstante, la brevedad de la frase no conlleva que automáticamente se catalogue como no protegible, pues los tribunales siguen sujetos a examinar si la frase o unión de estas cumple con los criterios de originalidad y creatividad. *Oracle America Inc. v. Google, Inc.*, 750 F.3d 1339, 1362 (Fed. Cir. 2014); *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 52 (1st Cir. 2012). Véase, 1 *Nimmer on Copyright* Sec. 2.01[B][3], pág. 2-20.1 ("[E]ven a short phrase may command copyright protection if it exhibits sufficient creativity.").

Por otro lado, y de particular importancia al caso de autos, abundemos sobre la protección de la "voz" bajo el derecho de autor. Esto surge a diferencia del tratamiento

---

[22] 37 C.F.R. Sec. 202.1(a). Véase, Salazar, *op. cit.*, pág. 49.

que el derecho a la propia imagen le da y que próximamente evaluaremos.

La voz es un atributo natural de la persona que la identifica, es un instrumento de comunicación y expresión, como también puede ser un instrumento musical y de trabajo con un valor económico protegible.[23] No obstante, la "voz" *per se*, no goza de protección intelectual en los distintos ordenamientos consultados, aunque sí lo pudiera tener bajo el derecho a la intimidad, a la propia imagen, marcas y competencia desleal. *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988). Véase, 2 *Entertainment Law 3d: Legal Concepts and Business Practices* Sec. 19:158.

Así, en el derecho de *copyright*, la voz no goza de protección. *Midler v. Ford Motor Co.*, *supra*, ("Copyright protects 'original works of authorship fixed in any tangible medium of expression.' 17 USC Sec. 102(a). A voice is not copyrightable. The sounds are not 'fixed.' What is put forward as protectible here is more personal than any work of authorship."). Véase además, 1 Nimmer on Copyright, sec. 2.10(A)(1)(b). ("no statutory copyright may be claimed in sounds not embodied in any tangible medium").  Como norma general, tampoco es protegible la interpretación que con la

---

[23] J. Ammerman Yebra, *El derecho a la propia voz como derecho de la personalidad* (2020)(Tesis doctoral, Universidad de Santiago de Compostela) disponible en https://minerva.usc.gal/rest/api/ core/bitstreams/2eda1f75-cb14-493d-8dac-5311d6e78299/content.

voz se haga.[24] Sin embargo, desde el 1972, las grabaciones sonoras, que pueden incluir aquellos sonidos emitidos por la voz humana, sí cuentan con alguna protección del derecho de *copyright*, sujeto a los requisitos de originalidad y creatividad.[25] Estos pueden surgir de la interpretación que en tales casos capture la grabación.[26]

Reseñado lo anterior y ya identificada la autoría sobre una obra, la *Ley de Derechos Morales de Autor*, *supra*,

---

[24] 3 *Nimmer on Copyright* sec. 8E.02 ("[P]rotection of such performances has traditionally been the province of common law copyright and other creatures of state law.").

Cabe señalar que, el ordenamiento internacional y federal protege contra las grabaciones y transmisiones de sonido no autorizadas por el intérprete. 17 USC Sec. 1101. Véase, 3 *Nimmer on Copyright* sec. 8E.01-03, sobre los derechos conexos de artistas intérpretes o ejecutantes, los productores de grabaciones de sonido y los organismos de radiodifusión, así como sobre las protecciones limitadas que la ley provee para cumplir con el Acuerdo sobre los Aspectos de los Derechos de Propiedad intelectual Relacionados con el Comercio (TRIPS por sus siglas en inglés).

Ammerman Yebra, *op. cit.*, pág. 240, explica que las interpretaciones de los artistas intérpretes o ejecutantes en el ámbito de la propiedad intelectual se protegen por constituir una aportación creativa derivada de la propia personalidad del artista, por lo que este tiene el derecho a prohibir que se reproduzca la versión concreta que interpreta. Añade que, "no se tratará de derechos de propiedad intelectual sobre la obra en sí de la cual la voz es el soporte, sino de la protección de la propia prestación artística".

[25] El derecho de *copyright* reconoce la categoría de grabaciones sonoras ("sound recordings") de forma separada a la música y letra y también sujeta a esta categoría a los criterios de originalidad y creatividad. 17 USC Sec. 102. Véanse, 2 *Patry on Copyright* sec. 3:161.50; 4 *Patry on Copyright* sec. 11:16. Su titular tiene derechos de *copyright* sobre los sonidos específicos que esta contenga conforme a la Sec. 106.1-3. Salazar, *op. cit.*, pág. 151.

El término "sound recording" es definido como "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as discs, tapes, or other phonorecords, in which they are embodied". 17 USC Sec. 101. Se protegen de esta forma los sonidos y la interpretación en la grabación. 1 *Patry on Copyright* sec. 1:70.

[26] 1 *Nimmer on Copyright* sec. 2.10(A)(2)(a). ("The emphasis or the shading of a musical note, the tone of voice, the inflection, the timing of a vocal rendition, musical or spoken, can all be original with the performer").

reconoce un nexo personal entre el autor y la obra independiente del valor monetario de la misma, a través de los derechos exclusivos e intransferibles de atribución, retracto, integridad y acceso a su obra, los cuales surgen al fijar la obra original en un medio tangible.[27] La violación de cualquiera de estos derechos morales faculta al autor o a sus derechohabientes a solicitar interdictos temporales o permanentes para vindicar sus derechos, al resarcimiento de los daños y a obtener una indemnización económica, siempre que se presente la acción correspondiente dentro del término de tres (3) años de conocer los hechos que dan base a la misma. 31 LPRA secs. 1401s-t.

### B. Derechos morales y la moción de desestimación

Aclarada la normativa vigente relacionada a los derechos morales de autor, examinemos el análisis que deben realizar los tribunales sobre la autoría -y en particular sobre el requisito de originalidad de la obra- al evaluar una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, *supra*.

Como expresáramos, la Regla 10.2 de Procedimiento Civil, *supra,* requiere que los tribunales identifiquen los elementos que establecen la causa de acción como parte del análisis para conceder o rechazar este tipo de solicitud. En un caso de derechos de autor, la autoría de una obra es parte

---

[27] Los derechos morales de autor se mantienen aún después de este haber cedido la obra, durante toda su vida y hasta setenta (70) años después de su muerte o hasta que la obra entre en el dominio público, lo que ocurra primero. 31 LPRA secs. 1401j(b) y 1401m. Véase, *Sucn. Rosado v. Acevedo Marrero*, *supra*, pág. 899.

de estos elementos. Así, aceptados como ciertos los hechos bien alegados en la demanda e interpretados lo más favorablemente posible para la parte demandante, el tribunal debe determinar si la demanda establece una reclamación válida por el autor de una obra que justifique el derecho al remedio solicitado, guiado por la experiencia y el sentido común.

Cabe señalar que en *Harguindey Ferrer v. U.I., supra*, y bajo el estándar normativo aplicable en ese momento,[28] tuvimos la oportunidad de examinar la corrección de la desestimación de una causa de acción por violación a los derechos morales presentada por el editor de la traducción de una obra literaria ya protegida por el *Copyright Act*. Particularmente, se cuestionaba la jurisdicción sobre la materia de los tribunales estatales para atender la alegada violación. En vista de que previamente no nos habíamos expresado sobre la autoría de un trabajo de edición, examinamos este elemento, y en particular, el concepto de "obra".

Sin guías estatutarias sobre las definiciones de estos conceptos, nuestro análisis en *Harguindey Ferrer v. U.I., supra*, se benefició del estudio de tratadistas, así como de la amplia discusión sobre el tema en el derecho federal; lo que nos llevó a concluir que el trabajo de edición es una labor intelectual independiente de la obra editada

---

[28] En *Harguindey Ferrer v. U.I.,* 148 DPR 13 (1999), aplicaba la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. III, y la Ley de Propiedad Intelectual de Puerto Rico, *supra*.

susceptible de protección del derecho moral de atribución, pues requería la depuración neta del texto. Dando por ciertas y buenas todas las alegaciones hechas en la demanda, determinamos que se había presentado una acción sobre la que los tribunales tenían jurisdicción, específicamente sobre el derecho moral de atribución de la creación editorial.

Con ello en mente, procedamos a examinar la aplicación de estos conceptos y la Regla 10.2 de Procedimiento Civil, *supra*, al caso de autos bajo el derecho vigente.[29]

De particular importancia para la desestimación de la primera causa de acción presentada en el caso de autos sobre la violación de los derechos morales de atribución e integridad de la demandante, el foro de instancia determinó

---

[29] No descartamos que puedan existir ocasiones en las que el análisis de la autoría y la originalidad de una obra sean asuntos que no se beneficien de ser atendidos mediante las alegaciones presentadas en una moción de desestimación sin permitir un descubrimiento de prueba amplio y la presentación de la evidencia ante los tribunales. Esto, ante elementos artísticos, tecnológicos, etc. que requieran ser comprendidos por los tribunales para descargar correctamente sus funciones.

Por otro lado, en vista de que el criterio de plausabilidad de las alegaciones utilizado al examinar una moción de desestimación, así como los de originalidad y creatividad de una obra se acogieron del derecho federal, parecería conveniente examinar cómo se han relacionado ambos en dicha jurisdicción. Sin embargo, hay ciertos elementos que distinguen nuestro ordenamiento jurídico y que pueden jugar un papel importante al considerar las alegaciones de falta de originalidad mediante una moción de desestimación en nuestra jurisdicción. Por ejemplo, observamos que tras la publicación de *Bell Atlantic Corp v. Twombly*, 550 US 544 (2007), y *Ashcroft v. Iqbal*, 556 US 662 (2009), principalmente los circuitos segundo y noveno han sido receptivos a atender argumentos de plausibilidad mediante moción de desestimación en casos de *copyright*. Sin embargo, previo a la presentación de una demanda por violación a *copyright* se realiza un registro ante el US Copyright Office, lo que a su vez otorga evidencia *primafacie* de autoría (*ownership*). 6 *Patry on Copyright* Sec. 19:2; Salazar, *op. cit.* págs. 285-287. Por existir dicho registro y por consiguiente la evidencia *prima facie* de autoría, los foros federales no han tenido la oportunidad de examinar (en casos publicados) la relación de estos elementos en las limitadas instancias cuando el autor no ha registrado su obra. *Tubio v. Adidas America, Inc.*, 2022 WL 19250159 (C.D. Cal. 2022)(No publicado); *Cat and Dogma, LLC v.Target Corporation*, 2021 WL 4726593 (5th Cir. 2021) (No publicado).

que en la letra y la grabación examinada no existía una obra protegida. Para ello, el Tribunal *a quo* dio por ciertos los hechos presentados en la Demanda. Específicamente, reconoció que mientras la demandante era novia del señor Martínez Ocasio, ambos tuvieron la idea de añadir la palabra "baby" seguido del nombre artístico seleccionado por él; que a petición de este, la demandante grabó su voz diciendo la frase y que la grabación sería utilizada para fines de "intro" en las canciones de Martínez Ocasio, siendo esta práctica usual entre los exponentes del género urbano. No obstante, al examinar la *Ley de Derechos Morales de Autor* y el derecho federal de *copyright*, el foro primario determinó que la grabación y la frase en cuestión se componía de tres palabas que aluden al nombre artístico del señor Martínez Ocasio, por lo que tenía el propósito de seguir la costumbre de otros exponentes de mencionar sus nombres al inicio de la canción, aunque pretendía transformar tal costumbre en algo más creativo. Por consiguiente, concluyó que la demandante sostuvo su reclamo en un bien carente de propiedad intelectual, al ser uno común y no original.

Al respecto, la demandante sostiene la existencia de una obra original. Añade que los foros recurridos erraron al utilizar criterios de derecho apoyados en las definiciones del *Copyright Act* para desestimar la acción, a pesar de que los derechos morales de autor son protecciones adicionales o separadas de las que puedan existir en la legislación federal. Por el contrario, recomienda recurrir a la

definición de "original" provista por la Real Academia Española, es decir, aquella "obra científica, artística, literaria o de cualquier otro género: [q]ue resulta de la inventiva de su autor".[30] Amparada en esta definición, sostiene que dado que la frase en disputa no existía antes de que ella la grabara, esta es una creación original. Añade que "[a] diferencia del derecho federal citado por los demandados, nuestra ley no requiere que la obra cumpla con determinado grado de creatividad para estar cubierta por la ley".[31] Además, expresa que surge de sus alegaciones, las cuales deben ser tomadas como ciertas, que es la autora, así como la descripción de la originalidad y la creatividad de la obra. En particular, sostiene que "no hay nadie más en el mundo [que] puede decir la frase "Bad Bunny Baby" como" ella, pues es la combinación de su voz, su entonación y la frase la que está protegida por los derechos morales de la Ley.[32] Por lo tanto, podemos observar que la demandante reclama derechos de autor por la frase y por la vocalización de la misma en la grabación sonora.

En primer lugar, no nos convencen los argumentos de la demandante de limitar nuestro análisis a la definición de "original" de la Real Academia Española. No cabe duda y en múltiples ocasiones hemos sostenido, que nuestro ordenamiento protege las creaciones del intelecto, por lo

---

[30] RAE, *Diccionario de la lengua española*, 23ª ed., México, Ed. Espasa Libros, 2014, pág. 1588.

[31] Apéndice del Recurso CC-2025-0212, pág. 183.

[32] *Íd.*

que requiere de una obra original que contenga un mínimo de creatividad. El significado de estos conceptos se ha nutrido del desarrollo del derecho civil, de nuestra jurisprudencia y de su coexistencia con el derecho federal de *copyright*. Como expresáramos, con la adopción de la *Ley de Derechos Morales de Autor, supra,* la Asamblea Legislativa ha acogido expresamente los criterios federales de "originalidad" y "creatividad" que adelantáramos en *Harguindey Ferrer v. U.I., supra*. Por lo tanto, aunque las protecciones que provee el derecho moral de autor son distintas a las del derecho de *copyright*, los tribunales tienen a su disposición estas fuentes para guiar su análisis sobre si se configuran los elementos de la causa de acción, tal y como hemos hecho en ocasiones anteriores. *Harguindey Ferrer v. U.I., supra*. Por consiguiente, es la interpretación de la parte demandante la que se aparta de nuestro análisis previo sobre estos conceptos.

Examinemos entonces el reclamo de derecho de autor que hace la demandante por la frase y su vocalización en la grabación. Tal y como reconoció en la Demanda, la frase se creó para comunicar la costumbre de los artistas del género urbano de incluir el nombre artístico en sus canciones. Al nombre artístico del señor Martínez Ocasio solamente se le añadió la palabra "baby". Concluimos que tal frase no goza de protección de derechos de autor, pues aparte de su brevedad, la parte demandante no pudo demostrar la existencia de una creación intelectual mínimamente creativa.

Ahora bien, la demandante dirige nuestro análisis a proteger un derecho moral sobre la grabación *per se*, lo que incluye la entonación de la frase que con su voz hizo al decirla, es decir, la grabación de su interpretación.  La voz, como rasgo o atributo natural de una persona, no es protegible como derecho de autor, pues no cumple con la definición de obra antes reseñada al no ser una creación de la mente humana original y creativa fijada en un medio tangible. Tampoco lo es la prestación artística y creativa que con su voz la demandante pudiera lograr.  Sin embargo, en tanto esa prestación con su voz sea fijada en un medio tangible, reconocemos que pueden germinar derechos de autor sobre la grabación. Dicho esto, la señora De la Cruz Hernández reclamó en su Demanda que se utilizó indebidamente la grabación de su interpretación personal, distinguible e incomparable de la frase y que fue utilizada sin la debida atribución. Por lo tanto, concluimos que la demandante ha presentado hechos suficientes para ofrecer en su día la prueba que justifique este reclamo. En vista de ello, erraron los foros inferiores al desestimar la causa de acción bajo la *Ley de Derechos Morales de Autor*, *supra*.

## IV.

### A. Derecho a la propia imagen

La Carta de Derechos de la Constitución de Puerto Rico protege la dignidad de las personas y el derecho fundamental a la intimidad, el cual es un derecho de la personalidad que goza de la más alta protección constitucional.  Art. II,

Secs. 1 y 8, Const. PR, LPRA, Tomo 1, ed. 2023, págs. 227 y 328. *Vigoreaux Lorenzana v. Quizno's*, 173 DPR 254 (2008). Debido a la primacía y envergadura de este derecho fundamental, hemos señalado que opera *ex proprio vigore* y es ejercitable entre personas privadas. *Íd.*

Hace poco más de cuatro décadas, reconocimos el derecho a la propia imagen como vertiente del derecho a la intimidad. *Colón v. Romero Barceló*, 112 DPR 573 (1982). Esto surgió, pues "la imagen propia constituye un atributo fundamental con el cual se individualiza socialmente a la persona; es decir, es parte integral de la identidad del representado". *Vigoreaux Lorenzana v. Quizno's*, *supra*, citando a *López Tristani v. Maldonado*, 168 DPR 838 (2006). Más recientemente, en *Vigoreaux Lorenzana v. Quizno's*, *supra*, afirmamos su extensión patrimonial (derecho a la publicidad). Por lo tanto, una persona tiene el derecho y la expectativa de controlar dónde, cuándo y cómo se capta, reproduce o publica su imagen, así como a participar económicamente de su comercialización. Esto ocurre aun cuando no se interfiera con la esfera íntima y privada de su vida. *Vigoreaux Lorenzana v. Quizno's*, *supra*. Por todo lo anterior, la propia imagen es digna de tutela ante la indebida apropiación de la misma, ya sea o no para fines lucrativos o comerciales. *Íd.* Este derecho se puede hacer valer o resarcir mediante una acción en daños y perjuicios al amparo de las normas de

responsabilidad extracontractual del Código Civil.[33] **Para ello basta que se capture, reproduzca o publique, entre otras formas, la imagen de una persona por otra que no cuenta con su consentimiento expreso o tácito.**

Sin embargo, la protección constitucional de la intimidad no es absoluta y cede ante valores fundamentales, en circunstancias especiales e intereses apremiantes y ante la ausencia de otros medios alternos para lograr sus objetivos. Particularmente, hemos reconocido que el derecho a la propia imagen está sujeto a la amplitud del consentimiento del portador del derecho,[34] a las distintas formas de apropiación que pudieran afectar este derecho con menor o mayor intensidad,[35] y a diversas causas de justificación. En cuanto a estas últimas, hemos identificado: la esfera de historia contemporánea, el interés público, el interés artístico, la accesoriedad de la imagen o el que prevalezca el ejercicio legítimo de otro

---

[33] El Art. 1802 del Código Civil de 1930 (31 LPRA ant. sec. 5141), hoy corresponde al Art. 1536 del Código Civil (31 LPRA sec. 10801). Véase, *Vigoreaux Lorenzana v. Quizno's*, 173 DPR 254, 261 (2008); *Pérez Vda. Muñiz v. Criado*, 151 DPR 355, 373 (2000); *Colón v. Romero Barceló*, 112 DPR 573, 577 (1982).

[34] *Colón v. Romero Barceló*, *supra*, pág. 578, citando a Santos Briz, *Derechos de Daños*, Madrid, 1963, págs. 178-179 ("La autorización para ser publicada puede incluir alguna limitación cuya amplitud se determinará según la interpretación del caso concreto".).

[35] *Id.*, pág. 578. ("[L]a publicación afecta a la personalidad del interesado más intensamente que el simple hecho de retratarlo"). Véase, Ammerman Yebra, *op. cit.*, pág. 192 (En España, "el TS ha distinguido entre un primer consentimiento para ser fotografiado, y un segundo consentimiento expreso para que esa fotografía se publique, por lo que de contarse con el primero pero no con el segundo, se podrá reputar intromisión ilegítima la publicación de una fotografía".).

derecho en el balance de intereses, entre otros.[36] *Vigoreaux Lorenzana v. Quizno's*, *supra*; *Colón, Ramírez v. Televicentro de P.R.*, 175 DPR 690, 709 (2009), citando a *Clavell v. El Vocero de P.R.*, 115 DPR 685 (1984); *Castro v. Tiendas Pitusa*, 159 DPR 650 (2003); *Bonilla Medina v. P.N.P.*, 140 DPR 294 (1996); *Colón v. Romero Barceló*, *supra*.

Señalado lo anterior, la protección al derecho patrimonial a la propia imagen (derecho a la publicidad),[37] también ha sido plasmada en la *Ley del Derecho sobre la Propia Imagen*, *supra*, estatuto que adopta nuestra jurisprudencia con relación a la manifestación patrimonial o económica que tal derecho ampara y conllevó el estudio de las legislaciones promulgadas en los Estados Unidos entonces vigentes.[38] Este estatuto reconoce la facultad del individuo,

---

[36] *Vigoreaux Lorenzana v. Quizno's*, *supra*, págs. 264-265, citando a *Colón v. Romero Barceló*, *supra*, pág. 580("[T]oda lesión de la personalidad es antijurídica salvo que concurra una causa de justificación o el consentimiento del afectado, o que el acto se considere socialmente adecuado por ser conforme a derecho en atención a la ordenación ético-social de la vida común. […] No obstante, […] aún en estos casos no debe tolerarse tomar o publicar una fotografía cuando a ello se oponga un interés legítimo, como lo sería el derecho a la intimidad del fotografiado. Igualmente, debe considerarse inadmisible la publicación de una fotografía cuando su toma haya violado intereses dignos de una protección predominante".)(citas omitidas). *Id*. pág. 264, (Hemos identificado como defensas oponibles "la esfera llamada de historia contemporánea […] no referida a la vida privada, o cuando se reproduzcan reuniones, manifestaciones u otros actos públicos semejantes o sucesos o localidades públicos en los que la persona … sea una figura accesoria. [… Además,]se admite la publicación de fotografías hechas sin petición del interesado cuando así lo justifique un serio interés artístico o cuando el derecho constitucional a la libertad de expresión del demandado prevalezca sobre los intereses del sujeto fotografiado.").

[37] *Vigoreaux Lorenzana v. Quizno's*, *supra*, n. 9.

[38] Véanse, *Vigoreaux Lorenzana v. Quizno's*, *supra*; *Castro v. Tiendas Pitusa*, 159 DPR 650 (2003); *Bonilla Medina v. P.N.P.*, 140 DPR 294 (1996); *Vega et al. v. Telefónica*, 156 DPR 584 (2002); *Arroyo v. Rattan Specialties*, 117 DPR 35 (1986), y *Colón v. Romero Barceló*, *supra*.

aunque no sea figura pública, de participar en la comercialización de su imagen mientras ofrece herramientas para protegerla del uso no autorizado con fines comerciales, mercantiles o publicitarios.

Específicamente, el término imagen comprende el "nombre, fotografía, retrato, voz, firma, atributo o cualquier representación de una persona que sirva para identificar a esa persona, ante un observador o escucha promedio, mediante cualquier procedimiento o técnica de reproducción". 32 LPRA sec. 3151(c). La imagen, así definida, es protegida de la explotación comercial, mercantil y publicitaria.

A diferencia de otras jurisdicciones estatales en las que estos conceptos no han sido definidos individualmente y son categorías superpuestas, en Puerto Rico la Asamblea Legislativa optó por definir dos de estos tipos de explotación: "propósito comercial" y "propósitos publicitarios". El primero se define como "el uso de la imagen de una persona en conexión con el anuncio, la oferta de venta o la venta de un producto, mercancía, bien o servicio en el mercado" y el segundo como "el uso de la

---

Además, se reseña en P. Cabán Vales y L.N. Cruz Rivera, *El Right of Publicity Estadounidense en la Ley del Derecho sobre la Propia Imagen*, 53 Rev. Jur. UIPR 495, 505 (2019), que "[e]n el diseño de las disposiciones de la Ley del Derecho sobre la Propia Imagen, se consideraron todas las legislaciones sobre el right of publicity entonces vigentes en Estados Unidos. En ese proceso, las legislaciones de California, Florida y, en menor medida, la de Indiana ocuparon un lugar destacado". Véase además, R.A. Smolla, *Law of Defamation*, 2d ed., Vol 2, Sec. 10:4, pág. 499("The "right of publicity" or "appropriation" torts may be entirely common-law doctrines in some jurisdictions or may be replaced by statutes enacted to supplant the common-law action, or the common-law and statutory actions may co-exist side-by-side.").

imagen de una persona al difundir o informar al público sobre un bien o servicio en el mercado a través de los medios de comunicación, incluyendo el uso en los anuncios institucionales". 32 LPRA Sec. 3151.

Aunque la línea entre una expresión y un uso comercial puede ser difícil de delimitar, hay concierto en que estos conceptos requieren más que una simple ganancia por la venta del material publicado que utiliza la imagen del demandante,[39] pues lo que se examina es el uso, y particularmente si este es para atraer la atención o transmitir el mensaje de que el demandante endosa un trabajo ("work"), producto o servicio. 1 *Nimmer on Copyright* sec. 1.17[B][3][a], págs. 1-180 y 1-182 citando Restatement (Third) of Unfair Competition, Sec. 47 comment c.

Ante el uso no consentido, la ley provee como remedios: el recurso de interdicto y la causa de acción en daños y perjuicios a la persona cuya imagen fue utilizada de forma no consentida. Esta causa de acción "aplica a cualquier acto o evento que ocurra dentro de los límites territoriales de Puerto Rico, independientemente del domicilio, residencia o ciudadanía de la persona". 32 LPRA sec. 3151 nota. No obstante, debido a su componente propietario (comercial), este derecho es enajenable mediante transferencia escrita.

---

[39] R.A. Smolla, *op. cit.*, págs. 516-517 ("[C]ourts generally acknowledge that commercial exploitation means something other than the mere gain that comes from selling more issues of the publication in which the plaintiff´s name or likeness is used".).

*Friger Salgueiro v. Mech-Tech College LLC. y otros*, op. res. el 20 de marzo de 2026.

El estatuto también reconoce ciertas excepciones en las que no aplica. En estas excepciones permea que la imagen no sea usada con propósitos comerciales o publicitarios, entre otras. "Esta exclusión, sin embargo, no significa que la imagen o la identidad puedan utilizarse en esos contextos sin permiso; lo que implica es que esas situaciones seguirán siendo sancionadas conforme a la jurisprudencia interpretativa de la [C]onstitución y del articulado del Código Civil por responsabilidad civil extracontractual". P. Cabán Vales y L.N. Cruz Rivera, *El Right of Publicity Estadounidense en la Ley del Derecho sobre la Propia Imagen*, 53 Rev. Jur. UIPR 495, 501 (2019).

**B. La Moción de desestimación y la *Ley del Derecho Sobre la Propia Imagen, supra*.**

En el Recurso CC-2025-0214, Rimas sostiene que la demandante no logró exponer una reclamación con relación al uso no consentido de su voz para propósitos comerciales, mercantiles o publicitarios, según definidos por la *Ley del Derecho sobre la Propia Imagen, supra*. Esto surge al no proveer ningún hecho o evidencia que sustente su uso para "el anuncio, la oferta de venta o la venta" de la canción, pues no basta que su voz fuera objeto de beneficio económico para los demandados. Además, señala que el estatuto exime de su aplicación cuando se utilice la imagen de una persona de manera accesoria. Por lo tanto, sostiene que la causa de

acción amparada en este estatuto también debe ser desestimada.

En cambio, la demandante expresa que incluyó en sus alegaciones que los demandados utilizaron su voz: en promociones, plataformas sociales y musicales, televisión y radio, entre otros, relacionadas a un disco que rompió récord de ventas. Añade que su voz se utilizó para agregar valor a un bien comercial y así venderlo, como gancho de ventas del disco debido a la historia sentimental con el señor Martínez Ocasio relacionada al tema del mismo y que se apropiaron de su voz con ánimo de lucro sin haberle compensado.

Atendidos los argumentos de ambas partes, el foro primario concluyó que la demandante "expuso de manera plausible hechos que apuntan al fin comercial detrás del uso de la grabación, o su voz, en la canción "Dos Mil 16".[40] Así, consideró como un hecho cierto que, el 6 de mayo de 2022, el señor Martínez Ocasio publicó el álbum titulado "*Un Verano Sin Ti*" y que este incluyó la grabación con la voz de la demandante en la canción "Dos Mil 16". Esto ocurrió a pesar de que la demandante y los representantes de las partes codemandadas todavía no habían alcanzado un Acuerdo por escrito para tal uso.[41] También dio por cierto que este era un distintivo que se escuchaba en las canciones del señor

---

[40] Sentencia Parcial de 13 de septiembre de 2024, Apéndice del Recurso CC-2025-0212, págs. 45-46.

[41] *Id.*

Martínez Ocasio cuando comenzó su carrera musical. Por lo tanto, al utilizarse nuevamente después de tanto tiempo y divulgarse en las redes sociales que la voz de la grabación pertenecía a la demandante, se "causó mucha conmoción y euforia entre sus fanáticos" y provocó que miles de ellos realizaran suposiciones sobre que el álbum y la canción eran dedicados a la demandante.[42]

Como expresáramos, ante una moción de desestimación, debemos asumir como ciertos los hechos bien alegados en la demanda y evaluar las alegaciones conjuntamente y de la forma más favorable para la parte demandante. Así las cosas, el tribunal, guiado por su experiencia y sentido común, debe examinar si los hechos alegados demuestran una reclamación más allá de un nivel especulativo que justifique la concesión de un remedio. Para ello, no se requiere evidencia de cada elemento de la acción o como pretende la parte demandada sobre cada evento de promoción, entre otros. *St. Mary v. Denton*, 2026 TSPR 35; 218 DPR __ (2026). Por lo tanto, concluimos que los tribunales inferiores guiados por su experiencia y sentido común no erraron al determinar suficientes los hechos presentados sobre la explotación comercial o mercantil de la voz de la señora De la Cruz Hernández para atraer la atención sobre el bien en cuestión o para informar al público de este a través de los medios de comunicación. Asimismo, no erraron al no aceptar como

---

[42] *Id.*

justificación en esta etapa la accesoriedad del uso de la imagen de la demandante.

**C. La moción de desestimación y el derecho a la propia imagen como vertiente del Derecho de intimidad**

En el caso de autos, la parte demandante optó por presentar alegaciones alternativas con relación al derecho a la propia imagen. Es decir, en primera instancia solicitó la aplicación de la *Ley del Derecho sobre la Propia Imagen*, *supra*, por la explotación económica de su voz. No obstante, de entenderse que el uso de su imagen no fue comercial, solicitó, que en la alternativa, se considerara como una violación a su derecho de intimidad.[43] Esta última causa de acción fue desestimada por los foros recurridos tras concluir que no se presentaron los factores que revelaran cuál era la expectativa de intimidad que tenía la demandante en cuanto al uso de la grabación o su voz.[44]

En *Colón v. Romero Barceló*, *supra*, tuvimos la oportunidad de examinar la aplicación de la Regla 10.2 de Procedimiento Civil, *supra*, a una acción por violación al derecho a la propia imagen como vertiente del derecho a la intimidad. Allí, atendimos la corrección de la desestimación de una causa de acción en daños y perjuicios por la publicación de la fotografía de una persona asesinada. Su

_____

[43] Como Sexta Causa de Acción, la parte demandante expresa que "[e]n su defecto, si el Tribunal entiende en su día que la causa de acción anterior no es aplicable, o sea que una canción o un disco no es una explotación comercial, entonces aplica el derecho de la imagen no comercial, el cual está protegido por la Constitución de Puerto Rico en su Artículo II, Sección 8, es decir, el derecho de la intimidad".

[44] Sentencia Parcial de 13 de septiembre de 2024, Apéndice del Recurso CC-2025-0212, pág. 48.

imagen fue utilizada en un anuncio relacionado a una consulta para una enmienda constitucional y con el alegado propósito de difundir un suceso con carácter noticioso y público para "crear conciencia en el pueblo sobre la alta criminalidad en el país". *Íd.*, pág. 577. Así, **por primera vez reconocimos el derecho de toda persona o sus herederos a oponerse a que su imagen se reproduzca y publique sin su consentimiento o sin existir justificación por la cual "el interés del agente público o privado sea de mayor valor o rango"**. *Colón v. Romero Barceló*, *supra*, pág. 580. Es decir, **"[t]oda lesión a la personalidad es antijurídica salvo que concurra una causa de justificación"**. Íd. Ante la antijuricidad de que se actuara en contrario, procede el correspondiente resarcimiento de daños por la lesión al derecho a la propia imagen que la publicación le pudiera causar. Concluimos que aun aceptando como válido el interés público indicado, este no justificaba la desestimación del caso. Esto es así, pues la intromisión a la intimidad no fue necesaria, inevitable ni constituyó el medio más adecuado para obtener un fin lícito justificable por el interés público. Ante los hechos expuestos, también concluimos que el derecho a lo privado era de superior jerarquía que la libertad de expresión aducida.

De la jurisprudencia discutida se deduce que un individuo tiene una expectativa de intimidad sobre su imagen. Por lo tanto, habrá cierto grado de intromisión a la intimidad cuando su imagen sea utilizada sin autorización.

Corresponde, entonces, examinar si existe una justificación o interés de mayor rango. Ante el balance entre los intereses en juego, esta intromisión puede considerarse "leve" como en *Bonilla Medina v. P.N.P., supra*, en cuanto aplicamos la justificación de "figura accesoria" a una imagen tomada en un evento de interés público y en un lugar a la vista del público general, oponible a la preeminencia de la expresión política. Por otro lado, puede considerarse "grave" como en *Colón v. Romero Barceló*, *supra*, caso en el que concluimos que se intentó capitalizar con la imagen de un individuo a costa del dolor ajeno.

En el caso de autos, alegado que la imagen de la señora De la Cruz Hernández fue usada o apropiada por la parte demandada sin su consentimiento y presentándose como única defensa el uso accesorio de la imagen, el cual fue descartado por los foros recurridos, concluimos que los foros inferiores erraron al desestimar la causa de acción.

### D. Derecho a la Propia Imagen y la prescripción

Procedamos a examinar si se encuentran prescritas las causas de acción relacionadas a la canción "Pa ti" presentadas al amparo de la *Ley del Derecho sobre la Propia Imagen*, *supra*, y el Art. 1536 del Código Civil, *infra*. Aclaramos que solamente realizamos este examen en cuanto a la canción "Pa ti", mas no en cuanto el uso de la grabación en otros discos o con relación a otras canciones, pues esas causas de acción relacionadas al uso posterior de la voz de la parte demandante no han sido desestimadas.

Aclarado lo anterior, la prescripción extintiva es una forma de extinción de los derechos por la inercia de su ejercicio dentro del plazo determinado por ley y ante la ausencia de algún acto interruptor que permita que este comience a transcurrir nuevamente, entiéndase, la presentación de una acción judicial, la reclamación extrajudicial y el reconocimiento de la deuda por el deudor. Arts. 1189 y 1197 del Código Civil, 31 LPRA secs. 9481 y 9489. Véase, *Rivera Ruiz et al. v. Mun. de Ponce et al.*, 196 DPR 410, 415 (2016). La prescripción está regulada por el Código Civil y se fundamenta en la necesidad de que haya estabilidad en las relaciones y la seguridad en el tráfico jurídico. *Cacho González et al. v. Santarrosa et al.*, 203 DPR 215, 228 (2019). No obstante, esta defensa es una afirmativa por lo que opera si es alegada por quien quiere aprovecharse de ella. Art. 1192 del Código Civil, 31 LPRA sec. 9484. Véanse, *Conde Cruz v. Resto Rodríguez et al.*, *supra*, pág. 1067; *Meléndez v. El Vocero de Puerto Rico*, 144 DPR 389, 399 (1997)(Per Curiam).

En materia de daños y perjuicios, ordinariamente opera un término prescriptivo de un año sujeto a la teoría cognoscitiva del daño. *Toro Rivera et als. v. ELA et al.*, 194 DPR 393 (2015). Por lo tanto, el término comienza a transcurrir desde que el agraviado conoce o debió conocer del daño que sufrió, quién lo causó y los elementos necesarios para ejercitar la causa de acción. Arts. 1190 y 1191, 1204 del Código Civil, 31 LPRA secs. 9482, 9483 y 9496.

Igual término establece el Art. 7 de la *Ley del Derecho sobre la Propia Imagen*, *supra,* al expresar que:

> [t]oda acción o procedimiento que se lleve a cabo para hacer cumplir cualquier disposición de esta Ley deberá iniciarse no más tarde de un (1) año a partir de la fecha en que la persona afectada adquirió o debió haber adquirido conocimiento del surgimiento de los hechos que dan pie a la causa de acción que sirve de base para dicha acción o procedimiento. 32 LPRA sec. 3156.

Sin embargo, para atender la relación entre publicaciones, las causas de acción sobre el material publicado y el término prescriptivo, hemos acogido la regla de la publicación única, la cual hemos sujetado a la idiosincrasia puertorriqueña, y por lo tanto, a la teoría cognoscitiva del daño.[45] *Colón, Ramírez v. Televicentro de P.R., supra; Ojeda v. El Vocero de P.R.,* 137 DPR 315 (1994). Así, hemos expresado que:

> La dignidad del ciudadano y la libertad de palabra son sujetos del ordenado equilibrio de intereses que informa el régimen constitucional. Estos valores preeminentes están resguardados por la "regla de la publicación única" o unitaria que adoptamos, según la cual la edición completa del periódico, revista o libro se considera una sola publicación que da lugar en caso de libelo, a una sola causa de acción, quedando la extensión del agravio, la distribución y circulación como elementos valorativos de daños.[46] *Díaz Segarra v. El Vocero,* 105 DPR 850 (1977).

En vista de que estos valores también se afectan con la publicación no consentida de la imagen de un individuo en

---

[45] Hemos rechazado la regla de derecho común de causa de acción múltiple (que reconoce una razón de pedir remedio por cada ejemplar del periódico vendido o entregado).

[46] Restatement Second, Torts Sec. 577A(4)(b) ("As to any single publication, all damages suffered in all jurisdictions can be recovered in the one action".).

publicaciones a través de medios de comunicación masiva, extendemos la Regla de Publicación Única a casos como el de autos.[47] De esta forma, esta regla previene la multiplicidad de acciones, el potencial de acoso y responsabilidad excesiva y el agotamiento de los recursos judiciales. *Firth v. State of New York*, 98 N.Y.2d 365, 369-70 (2002). Por lo tanto, la publicación completa y masiva de un disco, también se considera una sola causa de acción y no así cada ejemplar vendido o accedido (unidad de la acción).

En el caso de autos, la demandante argumenta que como parte de su derecho a la propia imagen informó a Rimas Entertainment, LLC su rechazo a que se continuara utilizando su voz en esta canción mediante un correo electrónico del 4 de mayo de 2022.[48] Por lo tanto, expresa que desde entonces

---

[47] Varias jurisdicciones han adoptado la Regla de la Publicación Única en casos de derecho a la propia imagen y en medios de publicación masiva. J. Thomas McCharthy, *The Rights of Publicity and Privacy*, Vol.2, págs. 725, 805-807 ("The single publication rule has also been held applicable to claims of invasion of privacy. The Uniform Single Publication Act [in effect in Arizona, California, Idaho, Illinois, New Mexico, North Dakota and Pennsylvania] … has been broadly read to include any tort claims based on the contents of mass publications. This language is broad enough to include a claim for infringement of the right of publicity."). *Id.*, pág. 726 esc. 351 ("The Nebraska publicity and privacy statute expressly incorporates the single publication rule. […] The Single Publication Rule is adopted at common law in New York and applies to the New York publicity-privacy statute.").

[48] La señora De La Cruz Hernández expresó que era menor de edad, y por lo tanto incapaz, cuando autorizó al señor Martínez Ocasio a usar la grabación que realizara de su voz en el 2015. No obstante, la demandante no provee hechos demostrativos de cómo este estado de incapacidad (ya advenida la mayoría de edad o porque su representante podía y debía actuar por ella) conllevara la suspensión de la prescripción hasta la presentación de la demanda en el 2022.

Por otro lado, la demandante también sostuvo que el término prescriptivo no justifica la desestimación cuando de las alegaciones no surge el momento en que comenzó a correr el periodo de prescripción. Ciertamente, hemos reconocido que "(e)l momento en que se conoce o debió conocerse el daño es materia de prueba e interpretación judicial, debido a la multiplicidad de circunstancias que inciden en el conocimiento del daño". *Toro Rivera et als. v. ELA et al.*, 194 DPR 393 (2015). No obstante,

cada vez que se toque, suene o utilice su voz en la canción "Pa ti" nace una nueva causa de acción bajo la doctrina de daños sucesivos.[49] Por otro lado, los demandados levantaron la defensa de prescripción e indicaron que el término correspondiente a las acciones presentadas sobre la obra musical "Pa' Ti" comenzó con la primera distribución pública en el 2016.

Aceptado que en Puerto Rico aplica la Regla de Publicación Única sujeta a la teoría cognoscitiva del daño, no podemos sino concluir que la amplitud propuesta por la demandante al sostener que nace una nueva causa de acción cada vez que la canción "Pa ti" se toque o suene, conlleva que aceptemos la regla de derecho común de Causa de Acción Múltiple, regla que ya hemos rechazado en nuestro ordenamiento para los casos de difamación y hoy para los

---

alegado y demostrado que el término hábil para presentar una acción está prescrito, le corresponde a la parte perjudicada por una publicación rebatir tal inferencia. *Ojeda v. El Vocero de P.R.*, 137 DPR 315, 336 (1994). Esto no ocurrió en el caso de autos.

[49] Para sustentar su posición de que surge una nueva causa de acción "cada vez que se toque, suene, o se utilice su voz", incluyendo en los conciertos del artista, la parte demandante ha traído a nuestra atención casos de tres jurisdicciones estatales de los Estados Unidos, dos de ellos publicados. *Lehman v. Discovery Communications, Inc.*, 332 F.Supp.2d 534 (2004)(sobre la retransmisión de un programa por televisión en 17 ocasiones); *Beaucom v. Haverty*, 805 So.2d 959 (2001). Aunque estas jurisdicciones han adoptado la Regla de Publicación Única y han reconocido publicaciones subsiguientes como nuevas causas de acción, estos casos no se pueden acoger en el vacío como pretende la parte demandante. No podemos obviar que son jurisdicciones que no reconocen la teoría cognoscitiva del daño y recurren al examen de ciertos elementos, como por ejemplo si se ha presentado a una nueva audiencia o mercado, o con nuevo propósito, para considerar si se ha realizado una nueva publicación. J. Thomas McCharthy, *op. cit.*, supra, pág. 816 ("[T]he majority of courts have refused to apply the Discovery rule of accrual to allegedly libelous matter appearing in a widely distributed publication"). La parte demandante no nos pone en condiciones para concluir, que a pesar de esas diferencias, debemos adoptar esta interpretación tanto para la canción "Pa ti" como para los conciertos en los que se tocaron las canciones que incluían su voz.

casos de propia imagen por el uso de la voz sin consentimiento en una expresión musical.

En vista de que la canción "Pa ti" fue publicada en el 2016 y de que se considera una sola publicación aunque se toque o suene en múltiples ocasiones, el término prescriptivo para presentar las acciones correspondientes comenzó a correr en el 2016.

Por lo tanto, dando como ciertos los hechos alegados de que los demandados no contaban con el consentimiento escrito, expreso o tácito de la demandante para utilizar su voz al publicar la Canción "Pa ti" en el 2016, han transcurrido seis años desde su publicación hasta la presentación de la demanda. No existiendo alegaciones en la misma a tenor con la Regla de la Única Publicación sobre nuevas publicaciones de la canción "Pa ti", a diferencia de las alegaciones del uso de la grabación en otras canciones o contextos, no erró el tribunal recurrido al sostener la desestimación de las causas de acción relacionadas a esta canción.

## V.

Por último, la demandante señala que alegó con suficiente especificidad los hechos que fundamentan tanto la negligencia personal como vicaria del señor Assad Byrne, y que los distingue de la actuación corporativa. Por ello, sostiene que el foro apelativo intermedio erró al desestimar todas las causas de acción en contra de este codemandado. Por otro lado, el señor Assad Byrne sostiene que en la Demanda solo se incluyeron alegaciones genéricas y

conclusorias en las que no se le menciona ni tampoco vincula en ninguna capacidad con los actos que le causaron daños a la demandante ni con los supuestos representantes que se comunicaron con ella. Por lo tanto, indica que no se le puede imputar responsabilidad personal ni por hecho ajeno. Expresa que la mera administración de la carrera del artista Martínez Ocasio y el control de los activos corporativos no es base suficiente para imputarle responsabilidad.

El Artículo 1536 del Código Civil, *supra*, dispone que, "[l]a persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo". Por lo tanto, la responsabilidad civil al amparo de esta disposición requiere la concurrencia de tres elementos: la existencia de un daño real; el nexo causal entre el daño y la acción u omisión del demandado y el acto u omisión, el cual tiene que ser culposo o negligente. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 768 (2023). Como excepción al principio de responsabilidad personal por los actos propios, mediante el Art. 1540 del Código Civil, supra, se codifica la responsabilidad vicaria. Se reconocen así, ciertas relaciones por las que se es llamado a responder por la culpa o negligencia de otro, entre ellas, la responsabilidad de "los patronos públicos o privados, por los daños que causan sus empleados en el servicio de las ramas en que los tengan empleados o con ocasión de sus funciones".[50] Véase, *Cruz*

---

[50] El Art. 1803 el Código Civil de 1930 (31 LPRA sec. 5142 (derogado)), especificaba que:

*Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 486 (2022). Para ello, un demandante debe establecer: (1) que existe una relación de dependencia entre el patrono y el empleado, (2) que el empleado actuó en el desempeño de las ramas de su oficio con el propósito de servir y proteger los intereses del patrono, y (3) que el empleado incurrió en culpa o negligencia en el desempeño de esas funciones. *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 983 (2021). Véase además, C. Zeno Santiago, *La responsabilidad civil extracontractual acorde con el Código Civil de Puerto Rico de 2020 y la Jurisprudencia puertorriqueña*, Tomo I, Bibliográficas, San Juan, 2024, pág. 456.

Ciertamente, la parte demandante presentó 188 alegaciones en la demanda incorporando los elementos de las distintas causas de acción presentadas. A través de estas se requiere establecer la reclamación contra cada demandado y sostener su responsabilidad por las violaciones que se le imputan, ya sea por hecho propio o por los actos de terceros. No obstante, las alegaciones en la demanda se limitan a expresar que el señor Assad Byrne es "quien maneja la carrera del artista Benito A. Martínez Ocasio y controla de forma

---

[l]a obligación que impone [el Art. 1802] *es exigible*, no sólo por los actos [u o]misiones propios, sino por los de aquellas personas de quienes [se d]ebe responder.
........
Lo son igualmente *los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de las ramas en que los tuvieran empleados, o con ocasión de sus funciones.*

las cuentas, dineros, activos, ingresos, frutos, acciones y/o participaciones propietarias en entidades que pertenecen a él, el artista o ambas partes"; que "es dueño y/o mantiene una participación propietaria sustancial" en Rimas Entertainment, LLC, y que "el 3 de mayo de 2022, Jomar D. Dávila Narváez ("Dávila"), en representación de Noah Assad, Rimas y Martínez, se comunicó con De la Cruz mediante la plataforma social de Instagram" para comprar la grabación con su voz".[51] Aun evaluando las alegaciones conjuntamente y de la forma más favorable a la parte demandante, la demanda no expresa qué participación tuvo el señor Assad Byrne en los hechos ni cómo el señor Dávila Narváez tenía capacidad para hacer representaciones en su nombre o como su empleado, de forma que de los hechos alegados surjan las causas de acción en su contra. Por lo tanto, concluimos que la demanda no logró establecer una reclamación válida contra el señor Assad Byrne de que este era responsable personal y/o vicariamente de la actuación de los empleados o contratistas de Rimas. Por todo lo anterior, el foro recurrido no erró al desestimar las causas de acción presentadas contra el señor Assad Byrne.

**VI.**

Por los fundamentos expresados, se confirma en parte y se revoca en parte la Sentencia emitida por el Tribunal de Apelaciones el 14 de febrero de 2025 en los casos KLAN202401123 y KLCE202401359. Por consiguiente, se revoca

---

[51] *Demanda*, Apéndice del Recurso CC-2025-0212, págs. 57 y 64.

aquella parte que desestima la causa de acción por violaciones al derecho moral sobre la grabación con la voz de la demandante, así como en cuanto al derecho a la intimidad en su vertiente del derecho a la propia imagen. Asimismo, se confirma la Sentencia emitida por el Tribunal de Apelaciones el 14 de febrero de 2025 en el caso KLCE202500026 mediante la que se desestima la Demanda instada en contra del señor Assad Byrne y las acciones relacionadas a la canción "Pa ti" y los conciertos del artista. Se devuelve el caso al foro de instancia para la continuación de los procedimientos.

Se dictará Sentencia en conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos<br>_____<br>Carliz De La Cruz Hernández<br><br>Recurrida<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Peticionarios<br>_____<br>Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos | CC-2025-0212<br><br>Cons. con<br><br><br><br>CC-2025-0214<br><br>Cons. con<br><br><br><br>CC-2025-0228 |

SENTENCIA

En San Juan, Puerto Rico, a 8 de julio de 2026.

Por los fundamentos expuestos en la Opinión que antecede, los cuales se hacen formar parte de esta Sentencia, se confirma en parte y se revoca en parte la Sentencia emitida por el Tribunal de Apelaciones el 14 de febrero de 2025 en los casos KLAN202401123 y KLCE202401359. Por consiguiente, se revoca aquella parte que desestima la causa de acción por violaciones al derecho moral sobre la grabación con la voz de la demandante, así como en cuanto al derecho a la intimidad en su vertiente del derecho a la propia imagen. Asimismo, se confirma la Sentencia emitida

por el Tribunal de Apelaciones el 14 de febrero de 2025 en el caso KLCE202500026 mediante la que se desestima la Demanda instada en contra del señor Assad Byrne y las acciones relacionadas a la canción "Pa ti" y los conciertos del artista. Se devuelve el caso al foro de instancia para la continuación de los procedimientos.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emite las expresiones siguientes:

Estoy conforme con las determinaciones sobre el derecho a la propia imagen, la aplicación de la Regla de la Publicación Única y la desestimación de las causas contra el Sr. Noah Assad Byrne. No obstante, disiento en parte del resultado al cual arriba hoy este Tribual en cuanto a suficiencia de las reclamaciones de la Sra. Carliz De La Cruz Hernández (señora De La Cruz Hernández) sobre derechos morales de atribución e integridad sobre la obra.

A mi juicio, nos encontramos en la etapa adecuada para determinar si la causa de acción sobre derechos morales sobrevive una moción de desestimación, puesto que la *Ley de Derechos Morales de Autor*, Ley Núm. 55-2012, 31 LPRA sec. 1401j *et seq.* (Ley de Derechos Morales), establece que estos derechos "[s]urgen al momento en que el autor fija la obra original en un medio tangible de expresión". 31 LPRA sec. 1401j(b).

Aún si tomamos como ciertas las alegaciones de la señora De La Cruz Hernández para dilucidar si existe tal causa de acción, entiendo que no hay manera de probar que esta ostenta un derecho moral sobre el estribillo, puesto que este no cumple con los requisitos establecidos de creatividad y originalidad para que una obra se considere protegible bajo el estatuto citado. Por tanto, no estoy conforme con la determinación de revocar al Tribunal de Apelaciones a los efectos de conservar la causa de acción bajo la Ley de Derechos Morales.

El Juez Asociado señor Colón Pérez emite Opinión Disidente.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos | CC-2025-0212<br><br>Cons. con |
| Carliz De La Cruz Hernández<br><br>Recurrida<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Peticionarios | CC-2025-0214<br><br>Cons. con |
| Carliz De La Cruz Hernández<br><br>Peticionaria<br><br>v.<br><br>Rimas Entertainment, LLC y otros<br><br>Recurridos | CC-2025-0228 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 8 de julio de 2026.

Existen diferencias, disputas, demandas, deudas, daños, desilusiones, dolores y destinos divididos para los que los tribunales no tienen respuesta, para los que el Derecho no tiene solución. Muchas veces, las hojas de papel que integran los abultados expedientes ante nuestra consideración dejan entrever, mediante su difusa translucidez, una historia que la tinta impresa en ellos no es capaz de contar. De eso, a nuestro juicio, se trata el caso de epígrafe.

Con ello sobre el tintero, en esta ocasión, estábamos llamadas y llamados a determinar si, a la luz de los hechos narrados en la *Demanda* de autos, procedía algún remedio: (1) por alegadas infracciones a la Ley Núm. 55 de 9 de marzo de 2012, conocida como la Ley de Derechos Morales de Autor de Puerto Rico (en adelante, "Ley de Derechos Morales de Autor"), *infra*; o (2) por alegadas lesiones a la propia imagen, ya sea en su vertiente constitucional o en su vertiente estatutaria, bajo la Ley Núm. 139 de 13 de julio de 2011, conocida como la Ley del Derecho sobre la Propia Imagen (en adelante, "Ley de la Propia Imagen"), *infra*.[1]

Ante tal encrucijada, una mayoría de mis compañeras y compañeros de estrado concluye, de un lado, que, si bien el estribillo aquí en controversia no es protegible bajo la Ley de Derechos Morales de Autor, *infra*, el modo o entonación que se le dio a éste al grabarse, por sí solos, podrían hacerlo protegible. Igualmente, éstas y éstos hoy determinan que procede una reclamación por alegadas violaciones al derecho a la propia imagen, tanto constitucional como estatutario.

**De tal dictamen, -- y toda vez que entendemos que la totalidad de las causas de acción aquí en controversia debieron ser desestimadas --, disentimos. Veamos por qué.**

---

[1] Si bien la referida *Demanda* incluye otras causas de acción, entendemos innecesario incluirlas en nuestro análisis, ya sea porque no son propiamente causas de acción, sino defensas afirmativas o planteamientos en equidad, -- como la doctrina de los actos propios --; o se tratan de reclamaciones generales que están gobernadas por las normas especiales de los estatutos mencionados o de la jurisprudencia sobre la materia, en el caso del derecho a la propia imagen en su vertiente constitucional.

I.

Los hechos medulares que dan margen al presente litigio se recogen, con particular precisión, en la *Opinión* que hoy emite este Tribunal, razón por la cual hemos decidido adoptar los mismos por referencia. Así pues, procedemos a exponer la normativa que, a nuestro juicio, gobierna las controversias que hoy nos ocupan.

A.

Como se sabe, una parte contra la cual se presente una reclamación judicial puede solicitar la desestimación de ésta al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1135 (2024); *Costas Elena y otros v. Magic Sport y otros*, 213 DPR 523, 533 (2024); *Eagle Security v. Efrón Dorado et al.*, 211 DPR 70 (2023). Particularmente, la precitada regla permite solicitar la desestimación de una demanda por las siguientes razones: (1) falta de jurisdicción sobre la materia; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; **(5) dejar de exponer una reclamación que justifique la concesión de un remedio**; o (6) dejar de acumular una parte indispensable. *Díaz Vázquez et al. v. Colón Peña et al.*, *supra*; *Rivera, Lozada v. Universal*, 214 DPR 1007 (2024); *Costas Elena y otros v. Magic Sport y otros*, *supra*; *Conde Cruz v. Resto Rodríguez et al.*, 205 DPR 1043 (2020).

Ahora bien, para que proceda un planteamiento desestimatorio bajo la Regla 10.2 de Procedimiento Civil, *supra*, se tiene que demostrar, de forma certera, que la parte

demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que se pudiese probar en apoyo a su reclamación, aun interpretando la demanda lo más liberalmente en su favor. *Rivera San Feliz v. Junta de Directores,* 193 DPR 38, 49 (2015); *Ortiz Matías et al. v. Mora Development*, 187 DPR 649, 654 (2013). Para ello, se deben tomar como ciertos todos los hechos bien alegados en la demanda y, a su vez, considerarlos de la forma más favorable a la parte demandante. *Rivera, Lozada v. Universal*, *supra*; *Cobra Acquisitions v. Mun. Yabucoa et al.*, 210 DPR 829, 396 (2022); *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022); *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 267 (2021). **Empero, tal interpretación flexible no se puede utilizar como un pretexto para darle paso a reclamaciones frívolas, inmeritorias o jurídicamente improcedentes, ya sea por la insuficiencia de los hechos alegados en ellas para fundamentarlas o por la presencia de una defensa afirmativa o de un impedimento legal que las derroten.** Véase *Costas Elena y otros v. Magic Sport y otros*, *supra*, pág. 534, citando a R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. Lexis Nexis, 2017, Sec. 2604, pág. 307.

Adelantamos que éste es uno de esos casos en los que las alegaciones que se incluyen en la *Demanda* aquí bajo estudio, así como los contornos de aplicación de la normativa estatal y federal aplicable a éstas, tornan el presente litigio en uno totalmente improcedente, aun bajo el estándar de adjudicación más laxo y generoso que caracteriza la etapa procesal en que se encuentra el mismo. A continuación, explicamos el porqué.

B.

i.

En primer orden, y como es conocido, la Constitución de los Estados Unidos de América confiere al Congreso federal el poder enumerado de legislar para promover el desarrollo de las ciencias y de las artes útiles, asegurando a los autores e inventores, por periodos limitados, el derecho exclusivo sobre sus respectivas obras y descubrimientos. Art. I, Sec. 8, Cl. 8, Const. EE. UU., LPRA, Tomo 1. En virtud de la precitada disposición constitucional, el 31 de mayo de 1790, se aprobó la primera ley federal para proteger lo que se han denominado como *copyrights*, siendo la evolución de ese primer estatuto el actual Copyright Act de 1976. 17 U.S.C. secs. 101 *et seq.*

Conforme a este último cuerpo legal, los *copyrights* son un conjunto de derechos exclusivos sobre obras originales de autoría que se hayan fijado en un medio tangible de expresión desde el cual se puedan percibir, reproducir o, de otro modo, comunicar, ya sea directamente o con el apoyo de una máquina o dispositivo, incluyendo: (1) obras literarias; (2) **composiciones musicales y su letra**; (3) guiones y su música de acompañamiento; (4) pantomimas y coreografías; (5) obras pictóricas, gráficas o esculturales; (6) películas y otras obras audiovisuales; (7) **grabaciones de sonido**; y (8) diseños arquitectónicos. 17 U.S.C. sec. 102. En esa dirección, se reconocen, como derechos exclusivos sobre las mencionadas obras, los siguientes: (1) reproducirlas a través de copias o grabaciones sonoras; (2) preparar obras derivadas a partir de ellas; (3) distribuir al público copias o grabaciones sonoras

de ellas ya sea vendiéndolas, transfiriéndolas, prestándolas o alquilándolas; y (4) presentar, ejecutar o exhibir públicamente ciertas categorías de obras, incluyendo obras musicales y grabaciones de sonido, ya sea en vivo o mediante la transmisión digital del audio. 17 U.S.C. sec. 106.

Ahora bien, en el ejercicio de su poder constitucional enumerado, el Congreso de los Estados Unidos de América decidió federalizar todo lo concerniente a los referidos *copyrights*, a través de una declaración estatutaria expresa de campo ocupado. **A tenor de ésta última, ninguna persona podrá reclamar, -- bajo las normas del *common law* o de una ley estatal --, por violaciones a los derechos exclusivos antes mencionados, así como tampoco por cualquier equivalente de ellos, sobre cualquiera de las categorías de obras antes enumeradas.**[2] 17 U.S.C. sec. 301 (a).

ii.

En sintonía con lo anterior, y como un intento loable de ofrecer mayores protecciones a las comprendidas en el Copyright Act, *supra*, allá para el año 2012, la Asamblea Legislativa de Puerto Rico adoptó la Ley Núm. 55 de 9 de marzo de 2012, conocida como la Ley de Derechos Morales de Autor de Puerto Rico, 31 LPRA secs. 1401j *et seq*. **En síntesis, el**

---

[2] El texto original del estatuto en inglés reza así:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

**referido estatuto busca regular, en nuestra jurisdicción, la protección de los llamados "derechos morales de autor"; entiéndase, aquellos que, distinto de los** *copyrights***, surgen sólo por virtud de la relación personalísima existente entre el autor y su obra, independientemente del valor puramente monetario que ésta pueda tener.**[3] Art. 2 (b) de la Ley de Derechos Morales de Autor, *supra*. Dicho de otro modo, los derechos que el precitado estatuto supone proteger son aquellos concernientes al valor sentimental, filosófico o reputacional que la persona natural creadora de la obra podría desarrollar con esta última, a diferencia de aquellos relacionados con su explotación económica y daños pecuniarios. Es por ello que el profesor Hiram A. Meléndez Juarbe, en su artículo *Los derechos morales en Puerto Rico*, sostiene que, al menos retóricamente, "[e]l sistema federal protege el bolsillo de la autora; el de Puerto Rico, su corazón". H.A. Meléndez Juarbe, *Los derechos morales en Puerto Rico*, 90 Rev. Jur. UPR 751, 753 (2021).

A esos fines, la Ley de Derechos Morales de Autor, *supra*, establece cuatro derechos exclusivos sobre las mismas clases

---

[3] Cabe mencionar aquí que, luego de que los Estados Unidos de América se convirtiera, en 1988, en signatario del Convenio de Berna para la Protección de la Obras Literarias y Artísticas de 1886, el Congreso aprobó la Visual Artists Rights Act de 1990(en adelante, "VARA"), 17 U.S.C. sec. 106A. Ello, con el objetivo de atemperar el Copyright Act, *supra*, a las exigencias del referido tratado internacional, mediante el reconocimiento de ciertos derechos morales de autor para unas categorías limitadas de obras visuales realizadas sólo para propósitos de exhibición y de las que no se hayan hecho más de 200 copias firmadas y numeradas. *Íd*. Aunque VARA tiene su propia disposición de primacía federal, para efectos de este escrito, nos limitaremos a analizar los conflictos emanantes de la interacción entre los derechos morales reconocidos en el estatuto puertorriqueño con los derechos exclusivos garantizados por el Copyright Act, *supra*, así como los efectos que acarrea la disposición general expresa de campo ocupado y las normas constitucionales de primacía federal cuando surgen conflictos con las leyes estatales.

de obras cobijadas en el Copyright Act, *supra*.[4] Éstos son: (1) atribución, (2) retracto, (3) integridad y (4) acceso. Art. 2 (b) de la Ley de Derechos Morales de Autor, *supra*.

El primero de los precitados derechos que se desprenden de la Ley de Derechos Morales de Autor, *supra*, el de atribución, se refiere a que se reconozca la condición de autor cuando lo sea y a evitar que se le atribuyan obras ajenas cuando no lo sea. *Íd.* El segundo de los antes mencionados derechos, el de retracto, reconoce, en cambio, la posibilidad de renunciar a la autoría de una obra cuando ésta ya no coincida con las convicciones intelectuales o morales de quien la creó. *Íd.* El tercero de los derechos aquí bajo estudio, el de integridad, se ocupa de impedir: (1) la mutilación, deformación o alteración de la obra, de un modo tal que resulte en un menoscabo de los legítimos intereses o la reputación de su autora o autor; (2) la presentación pública o distribución de una obra así mutilada, deformada o alterada; y (3) la destrucción culposa o negligente de un original o ejemplar único. *Íd.* Finalmente, el cuarto derecho de la Ley de Derechos Morales de Autor, *supra,* el de acceso, busca que la persona que creó la obra pueda exigir un acceso razonable a su original o ejemplar único, cuando esté en manos de otra persona, para ejercer sobre ella el resto de sus derechos. *Íd.*

---

[4] Particularmente, el mencionado estatuto puertorriqueño define "obra" como una "creación original literaria, musical, visual (plástica o gráfica), dramática o de las artes interpretativas, artística, o de cualquier otro tipo de las que se producen con la inteligencia y que sea creativa, expresada en un medio tangible actualmente conocido o que se invente en el futuro". Art. 2 (d) de la Ley de Derechos Morales de Autor, *supra*.

**Como se puede apreciar de una primera lectura, parecería que los derechos antes enumerados se distinguen o, al menos, responden a intereses distintos de los derechos exclusivos que reconoce el Copyright Act, *supra*. No obstante, un problema surge, -- en escenarios particulares --, cuando al resolver determinada controversia al amparo de la Ley de Derechos Morales de Autor, *supra,* se confunden, en la práctica, los remedios que posee este estatuto con la indemnización económica que contempla el Copyright Act, *supra*. Tal es el caso de autos.** Nos explicamos.

iii.

Como expusimos antes, para que una ley estatal pueda sobrevivir la preeminencia expresa establecida en el Copyright Act, *supra*, ésta tiene que satisfacer dos requisitos básicos: (1) proteger categorías de obras no comprendidas en el referido estatuto federal; y (2) reconocer derechos distintos de los enumerados en este último, los cuales, a su vez, tampoco pueden actuar como sus equivalentes. Al respecto, el profesor Meléndez Juarbe nos comenta que, de entrada, resulta claro que la Ley de Derechos Morales de Autor, *supra*, falla la primera parte del análisis, toda vez que ésta no sólo comprende todas las obras reconocidas en el Copyright Act, *supra*, sino que "arropa todo tipo de obras imaginables que sean originales y estén fijadas en un medio tangible de expresión". Meléndez Juarbe, *supra*, pág. 806.

Sin embargo, es en el segundo elemento de la ecuación en el que radica una tensión evidente con la preeminencia federal, debido a que, según dicho académico, la manera en que

este Tribunal ha interpretado y aplicado el precitado estatuto dificulta concluir que los derechos morales que éste confiere no son equivalentes a los derechos del Copyright Act, *supra*. *Íd.* En esa dirección, Meléndez Juarbe sostiene que, "contrario a lo que ha resuelto [este] Tribunal Supremo, el mero hecho de que la ley de Puerto Rico atienda los intereses morales de la artista no hace de esta protección criolla una *no equivalente*". (Énfasis en el original). *Íd.*, pág. 810.

Sobre esto último, el profesor Meléndez Juarbe nos señala que no basta con examinar la declaración estatutaria expresa del Copyright Act, *supra*, sino que también se requiere considerar la norma constitucional de supremacía federal, en su vertiente de conflicto de leyes (*conflict preemption*).[5] *Íd.*, pág. 805. Lo anterior, debido a que, incluso si se entendiese que la Ley de Derechos Morales de Autor, *supra*, satisface la disposición estatutaria de campo ocupado del Copyright Act, *supra*, podría subsistir un problema bajo la referida regla constitucional si el precitado estatuto puertorriqueño, ya sea de su faz o en su aplicación, obstaculiza los objetivos de la ley federal. *Íd.* A esos

---

[5] Como se sabe, conforme a la Cláusula de Supremacía de la Constitución de los Estados Unidos de América, el Derecho federal constituye la Ley Suprema de la Nación, por lo que los jueces de los estados están obligados por ella y no prevalecerá ninguna norma estatal en contrario. Art. VI, Cl. 2, Const. EE. UU., *supra*. En virtud de tal disposición, se han reconocido dos escenarios en los que la ley federal prevalecerá sobre la estatal: (1) por disposición estatutaria expresa (*express preemption*); o (2) de manera implícita (*implied preemption*). Bajo este último, surge la modalidad de preeminencia por conflicto de leyes (*conflict preemption*), cuando una legislación estatal conflige con una federal, de modo que: (1) resulta físicamente imposible cumplir con ambas; o (2) la ley estatal representa un obstáculo para alcanzar y ejecutar plenamente todos los propósitos y objetivos del Congreso. Véase *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Arizona v. U.S.*, 567 U.S. 387, 399-400 (2012).

efectos, el mencionado docente nos enumera ejemplos paradigmáticos en los que interpretaciones del indicado estatuto puertorriqueño hacen palpable el hecho de que, en realidad, se están aplicando los derechos morales reconocidos en él como equivalentes de los derechos exclusivos del Copyright Act, *supra*.[6] Veamos algunos de ellos.

---

[6] Enfatizamos que tratados muy citados y respetados en el ámbito de la propiedad intelectual, -- como *Nimmer on Copyright*, *infra*, y *Patry on Copyright*, *infra* --, han levantado una voz de alerta sobre los serios problemas de preeminencia federal que representa la manera en que, tanto este Tribunal como el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, han aplicado la Ley de Derechos Morales de Autor, *supra*. **De un lado, -- y de gran pertinencia para la causa de autos --, Nimmer expresa preocupación por el fallo del foro primario federal en el caso *Monroig v. RMM Records & Video Corp.*, 19 F.R.D. 214, 220 (D. P.R. 2000), mediante el cual se concedió al cantautor Glenn Monroig una compensación económica de más de cinco millones de dólares ($5,000,000.00) por violaciones a sus derechos morales de autor, suscitadas en varios países, sobre una composición musical, al amparo de la Ley de Derechos Morales de Autor, *supra*, sin discutir los problemas de campo ocupado que ello representa.** 3 *Nimmer on Copyright* Sec. 8D.09 (2026) ("[I]t seems doubtful that the jury verdict in favor of the Puerto Rican songwriter, discussed above, could survive appropriate constitutional scrutiny."). **Asimismo, al comentar el precedente establecido en <u>*S.L.G. Negrón-Nieves v. Vera Monroig*, 182 DPR 218 (2011), Nimmer señala que esta Curia ha fallado en confrontar la realidad de que Puerto Rico está ofreciendo una protección más amplia sobre las mismas categorías de obras regidas por el Copyright Act, *supra*, así como tampoco ha reconocido el problema constitucional que ello representa.</u>** *Íd.* ("But it never confronts the fact that the Commonwealth is granting the same subject matter wider protection than does federal law, nor does it acknowledge any constitutional dimension arising in that regard."). **De otro lado, -- y, quizás, de forma más directa o severa que Nimmer --, el tratadista William F. Patry critica los constantes desaciertos de este Tribunal respecto al análisis de preeminencia del estatuto puertorriqueño. Primeramente, Patry puntualiza que este Foro ha intentado descansar en precedentes federales inaplicables, debido a que estos últimos sólo validaron leyes estatales que protegían categorías de obras no contempladas por la ley federal en el momento histórico en que fueron decididos.** 7 *Patry on Copyright* Sec. 27:4 (2026) ("[The Puerto Rico Supreme Court's] reliance on the then most-recent US Supreme Court opinion […] was misplaced. [In that precedent,] the Court upheld a California criminal law prohibiting record piracy. During the period in question, sound recordings were not subject to federal protection. By the time the case reached the Court, however, protection had been extended, and thus the decision's effect was retrospective only."). **Además, el referido comentarista aclara que, indistintamente de cuán arraigado históricamente esté un derecho moral en la tradición civilista puertorriqueña, si un derecho estatal es esencialmente lo mismo que uno federal, el primero está desplazado por el segundo, al igual que cualquier otro intento de conceder derechos económicos de *copyrights* bajo el Derecho puertorriqueño, ya sea estatutario o jurisprudencial.** *Íd.* ("If the state right is essentially the same as one granted in the federal statute, the state law is preempted, as are all efforts to accord economic copyright rights under Puerto Rican law, statutory or case law."). **Asimismo, Patry expone que la interpretación que esta Curia le ha dado al derecho de integridad, -- al extremo de incluir alterar o truncar la copia**

En primer lugar, en el contexto del derecho a mantener la integridad de la obra, tenemos el normativo caso de *Cotto Morales v. Ríos*, 140 DPR 604 (1996). Allí, este Tribunal entendió que ocultar o cortar tres octavos de pulgada de área impresa de una copia de un cartel contenida en un catálogo constituye una mutilación que da lugar a una compensación económica. *Íd.*, pág. 624. Nótese que no se trata de que se recortó la obra en sí, sino que, al reproducir una representación de ésta en otra publicación impresa, no se mostró la totalidad de la obra original. Ante tal escenario, resulta evidente que lo que allí se indemnizó, realmente, fueron infracciones a los derechos exclusivos federales de reproducción y adaptación de la obra.

De un modo similar al anterior, -- y de particular importancia para el caso de autos --, en *Pancorbo v. Wometco of P.R., Inc.*, 115 DPR 495, 501-502 (1984), se resolvió que insertar fragmentos de un programa televisivo de los demandantes en una película de los demandados, de un modo que los primeros consideraban objetable, infringía el derecho moral de integridad, por lo que procedía una compensación

---

de una obra --, hace que éste sea idéntico al derecho exclusivo federal de **preparar obras derivadas, pues la posibilidad de que tal modificación pueda parecer objetable u ofensiva al autor no resulta suficiente para distinguir uno del otro.** *Íd.* ("Altering and truncating a work is exactly what the right to prepare derivative works […] grants copyright owners. That the defendant's alteration or truncation may appear in content objectionable to the author does not make the integrity right of state law non-equivalent to the federal right."). **Finalmente, Patry sentencia que el análisis de preeminencia federal de este Tribunal deja que desear, particularmente, a la luz de la renuencia de este Foro a concluir que las demandas por daños económicos disfrazadas de reclamaciones morales son improcedentes por estar desplazadas por el Derecho federal.** *Íd.* ("Preemption analysis by the Puerto Rico Supreme Court leaves something to be desired. The largest danger lies in an unwillingness to find economic claims dressed up as droit moral claims preempted.").

económica. Evidentemente, las actuaciones allí condenadas constituían, realmente, infracciones a los derechos exclusivos federales de reproducción, ejecución pública y adaptación (siendo éstos, dicho sea de paso, los que podrían estar envueltos en el caso de epígrafe). Véase Meléndez Juarbe, *supra*, pág. 814; y 7 *Patry on Copyright* Sec. 27:4 (2026).

En segundo lugar, en lo relativo al derecho moral de atribución, Meléndez Juarbe nos ilustra que, si bien este último no está contemplado en la ley federal, ello no dispone del análisis de preeminencia federal, puesto que corresponde además examinar si la aplicación de tal reclamación representa un impedimento para alcanzar los objetivos del Copyright Act, *supra*, bajo la cláusula constitucional de supremacía. Meléndez Juarbe, *supra*, 824. En esa dirección, resulta patente que ese derecho se podría intentar utilizar, -- como, a nuestro juicio, se está intentando utilizar en el caso de autos --, como un mecanismo para obtener una compensación económica por planteamientos relacionados con derechos exclusivos federales, como los de reproducción, preparación de obras derivadas, distribución, presentación y ejecución pública. *Íd.* Lo anterior así, puesto que bastaría alegar que se incurrió en cualquiera de las actuaciones antes enumeradas sin dar crédito a la autora o al autor para que se le pueda dar paso a una indemnización económica. Ello constituye un claro conflicto con los intereses y objetivos del Congreso, de una manera más patente aún, cuando tal falta de atribución esté expresamente permitida por el Copyright Act, *supra*, como, por ejemplo, bajo la doctrina de uso justo (*fair use*). *Íd.*

**Recordemos que, para preservar la validez y el propósito del estatuto puertorriqueño, resulta indispensable que, como mínimo absoluto, su aplicación se restrinja a aquellos casos en los que: (1) realmente exista una conexión sentimental, filosófica o reputacional estrecha entre una autora o un autor y su obra (no cobijada por VARA,** *supra***); y (2) sus disposiciones verdaderamente se invoquen para alcanzar el propósito limitado de preservar, -- mediante remedios legales no pecuniarios o indemnizatorios --, esa relación intangible muy particular, y no como un subterfugio o pretexto artificioso para lograr, en los tribunales puertorriqueños, los objetivos propios de un litigio federal. Lamentablemente, -- en lo que al caso que nos ocupa se refiere --, una mayoría de este Alto Foro no lo entendió así.**

C.

En segundo orden, y como también se sabe, la Constitución del Estado Libre Asociado de Puerto Rico consagra, como derechos fundamentales, la dignidad y la intimidad de todas las personas. Art. II, Secs. 1 y 8, Const. ELA, LPRA, Tomo 1. Como corolario de tales garantías, hemos reconocido un derecho a la propia imagen como una extensión de la personalidad. *Friger Salgueiro v. Mech-Tech College, LLC*, 2026 TSPR 30, 218 DPR __ (2026); *Vigoreaux Lorenzana v. Quizno's*, 173 DPR 254, 262 (2008); *López Tristani v. Maldonado*, 168 DPR 838, 850 (2006). Desde su concepción, tal derecho, -- el cual opera por sí sólo (*ex proprio vigore*) y es oponible frente a todas las personas (*erga omnes*) --, ha buscado "otorgar a su titular la facultad […] de excluir que un tercero reproduzca o publique

su propia imagen sin consentimiento". *Friger Salgueiro v. Mech-Tech College, LLC*, *supra*, pág. 6, citando a *Vigoreaux Lorenzana v. Quizno's*, *supra*, pág. 266.

No obstante, -- en un esfuerzo de codificar los pronunciamientos de este Tribunal sobre el tema, así como de regular estatutariamente la mencionada causa de acción constitucional, particularmente, en el ámbito publicitario y comercial --, la Asamblea Legislativa de Puerto Rico promulgó la Ley Núm. 139 de 13 de julio de 2011, mejor conocida como la Ley del Derecho sobre la Propia Imagen, 32 LPRA secs. 3151 *et seq.* Como resultado, hoy nos enfrentamos a una dualidad de fuentes jurídicas que rigen las reclamaciones basadas en violaciones al derecho a la propia imagen: (1) una vertiente estatutaria, enfocada en lo publicitario y comercial; y (2) una vertiente constitucional, la cual es más general o difusa que la primera. Debido a que, en el presente litigio, se invocan ambas vertientes, nos vemos precisados a hacer algunas anotaciones respecto a cada una. Comencemos por esta última.

i.

En lo que a la vertiente constitucional del derecho a la propia imagen se refiere, siempre hemos reconocido dos elementos importantes para considerar si se ha configurado una causa de acción válida que dé lugar a una indemnización en daños, a saber: (1) el carácter meramente accesorio del uso de la imagen en cuestión, así como la existencia de un interés público o un serio interés artístico que lo justifique; y (2) la necesidad de que, cuando no se trate de propósitos publicitarios o comerciales, tal uso haya producido un daño o

intromisión patente a la dignidad, privacidad o reputación de la parte afectada, ya sea porque la expone a vergüenza social o vulnera los aspectos más fundamentales de la intimidad de la persona. *Colón v. Romero Barceló*, 112 DPR 573, 578-579 (1982); *Bonilla Medina v. P.N.P.*, 140 DPR 294, 302-303 (1996); *Vigoreaux Lorenzana v. Quizno's*, *supra*, págs. 264 y 272-273. Siendo ello así, y en vista de que los aspectos comerciales o publicitarios del uso de la imagen están ahora gobernados por una ley especial, la procedencia de una causa de acción por violaciones a la propia imagen en su vertiente constitucional requiere que se alegue cómo el uso de la imagen en cuestión ha representando un daño o intromisión en la esfera privada de la vida de la persona afectada, de modo que la exponga a vergüenza pública o, de otro modo, afecte los aspectos más esenciales de su dignidad. Lo anterior, claro está, sujeto al análisis de accesoriedad y de las justificaciones de intereses públicos y artísticos. *Íd.*

ii.

**Ahora bien, en lo aquí pertinente, la Ley de la Propia Imagen, *supra*, establece una causa de acción mediante la cual se puede reclamar en daños a cualquier persona que utilice la imagen de otra persona, con fines o propósitos comerciales, mercantiles o publicitarios, sin que haya mediado el consentimiento de ésta, de sus herederos o representantes.** Art. 3 de la Ley de la Propia Imagen, *supra*. **A esos efectos, el precitado estatuto define "imagen" como el "nombre, fotografía, retrato, voz, firma, atributo o cualquier representación de una persona <u>que sirva para identificar a esa</u>**

**persona, ante un observador o escucha promedio**, mediante **cualquier procedimiento o técnica de reproducción".** (Énfasis suplido). Art. 2 (c) de la Ley de la Propia Imagen, *supra*. **Asimismo, la mencionada ley precisa que un fin o propósito comercial o publicitario de la imagen de una persona se refiere a aquel que se hace "en conexión con el anuncio, la oferta de venta o la venta de un producto, mercancía, bien o servicio en el mercado" o "al difundir o informar al público sobre un bien o servicio en el mercado a través de los medios de comunicación, incluyendo el uso en los anuncios institucionales".** (Énfasis suplido). Art. 2 (h) e (i) de la Ley de la Propia Imagen, *supra*.

De las precitadas definiciones, surge claramente que, para que proceda una causa de acción al amparo de la mencionada ley, se requiere: (1) que el rasgo o atributo utilizado sirva para identificar a la persona en cuestión ante los ojos u oídos de un público promedio, -- entiéndase, que una audiencia común y corriente puede identificar a la persona con tan sólo percibir tal rasgo o atributo con sus sentidos --; y (2) que el fin o propósito para el que se utilice la imagen sea para promocionar o anunciar un producto o un servicio en el mercado. **Por lo tanto, dentro del lenguaje técnico del estatuto, los términos "comercial" o "publicitario" no significan la utilización de la imagen de una persona en una actividad que genere alguna ganancia o interés económico. Más bien, se refieren a que se aproveche el factor de reconocimiento de una persona, frente a un público promedio, para, precisamente, atraer a este último a comprar o consumir un producto o**

**servicio**. Como correctamente reconoce la *Opinión* mayoritaria, la explotación comercial se refiere a algo más que la mera ganancia resultante de vender más ejemplares de la publicación en la que se incluya la imagen de la parte demandante. 3 *Smolla & Nimmer on Freedom of Speech* Sec. 24:4 (2026) ("[C]ourts generally acknowledge that commercial exploitation means something other than the mere gain that comes from selling more issues of the publication in which the plaintiff's name or likeness is used.").

Por otro lado, la Ley de la Propia Imagen, *supra*, dispone que los derechos instaurados en ella son libremente transmisibles, en todo o en parte, a través de cualquier "transferencia escrita, incluyendo[,] pero no limitándose a un contrato firmado entre las partes, poderes, licencias, donaciones y testamentos, o mediante sucesión intestada". (Énfasis suplido). Art. 5 de la Ley de la Propia Imagen, *supra*. Por lo tanto, queda claro que lo importante para que un uso de la imagen sea autorizado, bajo el referido estatuto, radica en que tal anuencia quede evidenciada en un medio escrito, cualquiera que éste sea.

**Finalmente, cabe destacar que, -- en sintonía con la causa de acción constitucional --, la Ley de la Propia Imagen, *supra*, establece, ya de manera expresa, que ésta no aplicará cuando se utilice la imagen de una persona accesoria; entiéndase, "aquella que no se presenta en el plano principal de una comunicación, sino como parte de un grupo o figura de trasfondo".** Arts. 8 (d) y 2 (g) de la Ley de la Propia Imagen, *supra*. **Por lo tanto, en virtud de tal disposición expresa de**

**la ley, quedan excluidos de su causa de acción aquellos usos en que la imagen de la persona demandante no sea el elemento principal o el enfoque del mensaje, sino que sea meramente accesoria a éste, ya sea porque está diluida dentro de un grupo de personas o porque figura en un plano secundario tras la figura principal de la comunicación.**

Es, pues, a la luz de la normativa antes expuesta, que procedemos a explicar la razones por la que, a nuestro juicio, el presente litigio resulta totalmente improcedente. Veamos.

### III.

Como ya mencionamos, en esta ocasión, estábamos llamadas y llamados a determinar si, a la luz de los hechos narrados en la *Demanda* de autos, procedía algún remedio en favor de la parte demandante, ya sea al amparo de la Ley de Derechos Morales de Autor, *supra*, o del derecho a la propia imagen, bien sea en su vertiente estatutaria o constitucional. Como adelantamos, -- y como quedó evidenciado a través de la exposición del derecho que antecede --, la *Demanda* de epígrafe resulta totalmente inmeritoria, pues, incluso si consideráramos todos los hechos alegados en ella como ciertos y los interpretáramos de la manera más favorable para la parte reclamante, no se desprenden circunstancias fácticas que nos permitan colegir que se satisfacen todos los requisitos de las causas de acción aplicables o que no están presentes las defensas y causas de justificación que la derrotan.

Y es que, por un lado, la Sra. Carliz De La Cruz Hernández (en adelante, "señora De La Cruz Hernández") argumenta que la parte aquí recurrida, -- entiéndase, el señor Benito Antonio

Martínez Ocasio (en adelante, "señor Martínez Ocasio"), mejor conocido por su nombre artístico "Bad Bunny", así como el sello discográfico Rimas Entertainment, LLC y Rimas Classics, LLC (en adelante, "Rimas"), entre otras personas relacionadas --, infringió sus derechos morales de autor y su derecho a la propia imagen, tanto constitucional como estatutario, al utilizar ilícitamente una grabación que ésta realizó de su propia voz, a solicitud del señor Martínez Ocasio, diciendo el estribillo "Bad Bunny Baby". Específicamente, la señora De La Cruz Hernández aduce que la mencionada grabación fue incluida sin su consentimiento, autorización por escrito ni la correspondiente atribución en "canciones, discos, promociones, conciertos en el mundo entero y plataformas sociales y musicales, televisión y radio". *Demanda*, Apéndice del Recurso CC-2025-0212, pág. 74.

**De otro lado, el señor Martínez Ocasio y Rimas sostienen que la mencionada *Demanda* se debe desestimar en su totalidad, debido a que las alegaciones de ésta resultan insuficientes para sustentar cualquier causa de acción. Ello, toda vez que el estribillo y la grabación aquí en controversia no cumplen con los requisitos mínimos de originalidad y creatividad de una obra para merecer protección bajo la Ley de Derechos Morales de Autor, *supra*; así como porque la reclamación de autos tampoco demuestra que estén presentes las circunstancias dentro de las cuales pueden operar los derechos reconocidos en el referido estatuto, a la luz de la normativa federal. Igualmente, dichas partes aducen que las alegaciones de marras tampoco permiten concluir que pudiese proceder una reclamación**

**válida bajo el derecho a la propia imagen, -- ni estatutario ni constitucional --, puesto que: (1) el uso en cuestión no fue "comercial" o "publicitario", bajo las definiciones de la Ley de la Propia Imagen,** *supra*, **aunque se generasen ingresos a partir de las obras en las que se incluyó; y (2) tampoco se explica en la reclamación cómo tal uso lesionó la vida privada o íntima de la demandante. Asimismo, el señor Martínez Ocasio y Rimas plantean que no procede indemnizar daños ocurridos fuera de la jurisdicción de Puerto Rico; que algunas de las reclamaciones están prescritas; y que las causas de acción invocadas bajo leyes especiales absorben las generales, por lo que no proceden compensaciones duplicativas bajo ambas. Le asiste la razón al señor Martínez Ocasio y a Rimas.**

A.

De entrada, en lo referente a la causa de acción bajo la Ley de Derechos Morales de Autor, *supra*, suscribimos totalmente la conclusión mayoritaria de que el estribillo "Bad Bunny Baby" carece de la originalidad y creatividad suficiente para merecer protección bajo el referido estatuto. Por idénticas razones, entendemos que tal conclusión se debió haber extendido también a la entonación que se le dio a la referida frase en la grabación sonora aquí en pugna. Sin embargo, -- más importante aún que lo anterior --, nos parece que es el claro problema de preeminencia federal, a raíz del alcance que aquí se le ha querido dar al precitado estatuto, la razón definitiva por la que no se le debió haber dado paso.

De una lectura de las alegaciones de hechos, de los daños reclamados y de las cuantías monetarias solicitadas en la *Demanda* de autos, se desprende, con meridiana claridad, que la verdadera intención de la señora De La Cruz Hernández es recibir una compensación económica por infracciones propias de los derechos exclusivos federales del Copyright Act, *supra*. A saber, el de reproducción (copiar la grabación sonora que ella creó); el de preparar obras derivadas y el de adaptación (tomar dichas copias de su grabación, modificarlas e insertarlas en canciones y otras obras); el de ejecución pública (tocar públicamente las canciones que contienen dicha grabación en conciertos y otros eventos, ya sea física, digital o electrónicamente); y el de distribución (la diseminación de las mencionadas obras en el comercio, ya sea vendiendo, prestando o alquilando copias o grabaciones sonoras de ellas). Su intención no es que la parte demandada reconozca públicamente que ella es la autora de la grabación en cuestión, su pretensión es que se le concedan sumas millonarias por las alegadas infracciones antes enumeradas, la cuales son propias de un litigio federal al amparo del Copyright Act, *supra*.

**Empero, lamentablemente, en esta ocasión, y en cuanto a este último aspecto, una mayoría de mis compañeras y compañeros de estrado no tan sólo evadió atender el patente problema de preeminencia que ha representado dar paso a tales acciones, sino que ha decidido empeorarlo, al borrar aún más las líneas que se pretendían utilizar para distinguir un estatuto del otro. Dicho de otro modo, el esquema que este Tribunal hoy avala consiste en nada más y nada menos que**

**permitir argumentar vagamente algún interés moral sobre una obra, -- cualquiera que sea --, con el objetivo de lograr, a través de los tribunales puertorriqueños, el mismo resultado que se obtendría mediante el correspondiente litigio en la esfera federal: obtener una compensación económica por lo que, en realidad, son infracciones de alguno de los derechos exclusivos reconocidos en el Copyright Act, *supra*, o alguna combinación de éstos. Fallan malamente al así hacerlo.[7]**

### B.

Ahora bien, en lo atinente a la causa de acción bajo el derecho de propia imagen, en sus vertientes constitucional y estatutaria, también somos del criterio que la misma, a la luz de las alegaciones contenidas en la *Demanda* aquí bajo estudio, resulta totalmente improcedente. Ello es así, toda vez que el uso de la imagen aquí en cuestión no tan sólo fue producto de la grabación y envío por correo electrónico de un sonido, de manera voluntaria y a petición de la parte que lo terminó utilizando, sino que el mismo ni tan siquiera satisface las definiciones de "comercial" o "publicitario" que activan las disposiciones de la Ley de la Propia Imagen, *supra*.

---

[7] Sobre este último extremo, -- y en vista del tracto procesal del presente litigio --, debemos aclarar que no se debe confundir un dictamen de un foro primario federal que devuelva un caso a un tribunal estatal de origen, con la validez de la norma finalmente adoptada o aplicada por este último. Es decir, una cosa es que, al examinar el contenido de una reclamación que ha sido removida ante sí, un tribunal federal entienda que carece de jurisdicción para atenderla o que nada impide que ésta se continúe dilucidando en el foro de procedencia; y otra cosa muy distinta es que, al atender ese mismo caso devuelto, el tribunal estatal, eventualmente, interprete, desarrolle o aplique una norma de forma tal que termine contraviniendo la preeminencia federal sobre el asunto del que se trate. A nuestro juicio, esto último fue lo que ocurrió en el caso de autos.

Como explicamos antes, el mero hecho de que se generen ingresos a partir de la obra en la que se utilizó la imagen de una persona resulta insuficiente para considerarse "comercial" o "publicitario", puesto que la referida ley requiere que el uso en cuestión se trate de aprovechar un rasgo reconocible de una persona, ante la percepción de una persona promedio, con el fin de promocionar o informar sobre un producto o servicio en el mercado. En el caso de autos, el uso de la imagen es parte de una obra artística musical, -- es decir, del producto en sí --, y no de una comunicación o anuncio comercial o publicitario para promocionarla.

Por último, en cuanto a la vertiente constitucional del derecho a la propia imagen, no tan sólo entendemos que resulta evidente, de su faz, que el uso de la voz de la señora De La Cruz Hernández en las canciones controvertidas es uno meramente accesorio a la obra principal, -- al ocupar un plano secundario muy minoritario y breve respecto a la voz principal y extensa del señor Martínez Ocasio --, sino que el mismo responde a un serio interés artístico en la discografía de este último. Pero más importante que lo anterior, de las alegaciones de la *Demanda* de autos, no vemos cómo la utilización de la imagen aquí en cuestión representa una intromisión en los aspectos más privados e íntimos de la vida de la señora De La Cruz Hernández, o cómo éstas sustentan que tal uso la expone a una situación de vergüenza o degradación social que mine su dignidad y reputación.

IV.

En fin, a partir de las razones antes expuestas, nos parece claro que, en el contexto del presente litigio, ninguna de las causas de acción invocadas por la señora De La Cruz Hernández resulta jurídicamente procedente, bajo cualquier derecho positivo disponible en nuestra jurisdicción, incluso dando por ciertos todos los hechos que ésta expone en su reclamación. De tal modo, a nuestro juicio, este caso se debió haber desestimado en su totalidad. Como ese no fue el curso de acción aquí seguido por una mayoría de mis compañeras y compañeros de estrado, respetuosamente, disentimos del dictamen que hoy aquí se emite.


                                        Ángel Colón Pérez
                                        Juez Asociado